W. W. BROWNING'S ADMINISTRATRIX v. J. ATKINSON.

1. In actions to establish boundary lines, courts should not confine themselves to the abstract principles of law, that calls for natural objects take precedence of all other calls, and that calls for artificial objects control course and distance ; the true rule to be observed is, that the call should be adopted which is most consistent with the intent apparent on the face of the deed.

2. It is only when lines called for in a deed are actually marked, and can be identified, that they control calls for course and distance ; and when the lines called for are of doubtful identity, course and distance should be resorted to as furnishing the best evidence the case is susceptible of.

3. It was error, in an action to establish boundary lines, to refuse to instruct the jury that a line clearly defined by calls for course and distance, would override an uncertain line based on the doubtful identity of natural or artificial objects ; the true rule being that the most certain and reliable evidence, all things considered, should have the greatest weight.

4. See this case for facts held not to constitute an estoppel *in pais*.

APPEAL from Washington. Tried below before the Hon. I. B. McFarland.

In this case both parties deraign title under Stephens (the original grantee) to different tracts of land, parts of a league situate in Washington county, the plaintiff (appellant) holding under the oldest conveyance from Stephens. The question involved is as to the location of the western line of the tract conveyed by Stephens to Elisha Roberts, the plaintiff's vendor.

This conveyance bears date June 13th, 1834. It contains no calls for either natural or artificial objects, with the exception of " stakes " and " posts," but by its calls for course and dis-

tance, it locates the western line at a point 1666⅔ varas S. 80°
W. from the S. E. corner of the league (as to the locality of
which there is no dispute), and in the south boundary of the
league.    The defendant, claiming under Stephens by subse-
quent conveyances, insists that the western line of the tract
conveyed by Stephens to Roberts is only about 1500 varas
from the S. E. corner of the league and of the survey, and
that its true location is to be determined by evidence of a
marked line, not called for in the deed itself.

The *locus in quo* lies between the line as determined by the
calls in Roberts' deed, and the line sought to be established by
proof, as the marked line of the west boundary of Roberts'
tract.    A reference to the original map, made by the county
surveyor, Biberstein, which accompanies the transcript, and a
reduced copy, which will be found on the opposite page, will
make the subject matter of the controversy plainer.    The pink
lines embrace the land called for by measurement in Roberts'
deed, under which plaintiff (appellant) claims; the yellow line
represents the marked line claimed by the defendant (appellee)
to be the western line of plaintiff's tract, as established by a
survey of the Roberts tract, made by Kinney in 1838.    The
disputed territory lies between this yellow line and the pink
line west of it.    Under the charge of the court, the jury found
that the yellow line was the western line of the Roberts deed,
and from the judgment based on that verdict the plaintiff has
appealed.

The plaintiff's title to the land in dispute is proven by the
surveyor's map and report, taken in connection with the deed
from Stephens to Roberts, and from Roberts down to the
plaintiff.    His deeds call to begin at the S. E. corner of the league,
the point designated on the map as JL, and running thence
S. 80° W. 1666⅔ varas to a stake.    This carries us beyond the
yellow line, and brings us to the pink one, for the S. W. corner
of Roberts' survey, from which the next call N. 10° W. 5000
varas to the north boundary line of the league, is coincident
with the pink line, and embraces the *locus in quo.*

Every deed under which the defendant claims, calls for the western boundary line of this Roberts' survey, and the first of them, that from Stephens to Wm. Keesee, as if to exclude the possibility of doubt as to what was the true line, describes the land as therein conveyed, as " Beginning at the " S. W. corner of a tract of one-third league of land, part of " the aforesaid league, heretofore sold by the party of the first " part (Stephens to Elisha Roberts), and to be made (1666) six- " teen hundred and sixty-six varas from the S. E. corner of the " league, and on the south boundary line thereof ; thence S. " 80° W.," etc., etc., the last course being " S. 10° E. to the " place of beginning," the identical line claimed by the plaintiff.

Again, the tract claimed by the defendant, called on the map the Harvey tract, but being the second tract sold by Stephens to Keesee in 1839, not only calls for the western line of the Roberts survey as its eastern boundary, but identifies it as claimed by the plaintiff by field-notes which the surveyor Biberstein says in his Report connect with the Roberts survey at its N. W. corner, and run with it 812 varas, where the Harvey survey closes. It will be seen from the maps and the surveyor's report, that the Harvey tract, the Cameron tract, and the 'Garrett tracts (the first and last of which are claimed by the defendant), all close upon the pink line, and that the Moore and Sterling tracts (also claimed by defendant) can only conform to them by closing on that line. Defendant claimed that the yellow line was the western boundary line of the Roberts tract, as fixed by an actual survey made in 1838, under the sale by Stephens to Roberts; and Kinney, a surveyor, testified that in 1838, he surveyed the Roberts tract, and then knew where the line was ; but, not having been on the land since, did not know, at the time of testifying, which was the line, or which the neighbors regarded as the line.

Cochran, a witness for the defendant, stated that he had lived near the southeast corner of the Roberts survey since 1835 ; was not present when Kinney surveyed the Roberts tract in 1838, but saw the lines shortly after they were made, and had always

regarded the yellow marked line as the west boundary line of the Roberts survey, and that the parties in interest, and the contiguous land owners had always so regarded it down to the institution of this suit.    The yellow marked line on the diagram was the only marked line in that immediate vicinity previous to 1861, when the pink line was first marked off.

It also appears from the evidence, that the Daughty heirs, who were the plaintiff's vendors, in making a division of this land in 1854, adopted the yellow-marked line as the west boundary line of the Roberts survey, and the defendant claimed that the plaintiff was thereby estopped from claiming another line which embraced more territory, and consequently more favorable to himself, as the west boundary line of that survey.

On the trial of the case the court below instructed the jury, on the question of boundary lines, merely that calls for natural objects took precedence of all other calls, and that calls for artificial objects controlled course and distance, and refused the following instructions asked by the plaintiff, as follows:

"*First*.  A line clearly defined by calls for course and distance " will override an uncertain line based on the doubtful identity " of natural or artificial objects; the true rule being that the " most certain and reliable evidence, all things considered, shall " have the greatest weight."

"*Third*.  If you believe from the evidence that in 1834 Stephens " sold to Roberts one-third of a league of land, and defined his " western boundary line by calls for course and distance only, " without actually marking it upon the ground, the parties to " whom Stephens afterwards sold, by deeds calling for Rob- " erts' western line, would be bound by that line as defined in " Roberts' deed."

On the question of estoppel the court below instructed the jury that " when parties, by words or acts, or both, induce or " suffer others to be misled to their prejudice, they are them- " selves estopped by such words or acts, and equity will not " relieve them in such cases."

" If you believe from the evidence that the words, or acts,

"or both, of the parties claiming the Elisha Roberts survey, by "holding out a given line to be their west line, and thereby "other parties were misled, or induced, or permitted to buy "lands by surveys running up to such west line, supposing "such west line to be the true line, then such parties so buying "will be protected in their purchase so made.

"If you believe that the defendant, or those under whom he "holds, purchased under such a state of facts as this, you will "find for the defendant."

The jury finding that the yellow-marked line was the western boundary line of the Roberts survey, judgment followed in his favor, and plaintiff has appealed, assigning for error the refusal of the court to give the instructions asked by the plaintiff in relation to boundary lines, and the charge of the court on the question of estoppel.

*Sayles & Bassetts*, for the appellant. It was error for the court to refuse the first charge asked by the plaintiff, to the effect that "a line clearly defined by calls for course and dis-"tance, will override an uncertain line, based on the doubtful "identity of natural or artificial objects, the true rule being "that the most certain and reliable evidence, all things consid-"ered, shall have the greatest weight."

In McCown v. Hill (26 T. R., 359), this court, per Bell, J., affirm the correctness of this principle, almost in the words of the charge asked and refused.

In Booth v. Strippelman (26 T. R., 440), this court, Moore, J., delivering the opinion, recognized the rule as asked in the charge, and, applying it, refused to permit "the call for course "and distance to be controlled by a call for a stake, in an open "and undefined line."

In Hubert v. Bartlett (9 T. R., 103), the leading case upon the question of boundary in this State, Wheeler, J., lays down the general rule as stated by the court below, but adds the qualification for which we contend, his language being that "when the calls lead to contrary (conflicting) results, that must

" be adopted which is most consistent with the intent apparent
" on the face of the grant; and, hence, there are many cases
" where the course and distance will control natural marks and
" boundaries."

And it is only where lines are actually marked that a call for
them will control course and distance. (1 Dev. & Bat. R., 427;
14 Penn. St. R., 59; 6 Peters' R., 508; 4 Wheat. R., 444; 4
Cond. R., 501; 1 Bibb's R., 467; 4 McClean's R., 279; 1 Hayn's
R., 22, 238, 376; 4 Serg. & R., 461; 12 Penn. St. R., 180.)

As we have already said, there is no proof in this case that
the disputed line was ever actually marked; and if that fact
had been conceded, the defendant certainly did not clearly es-
tablish it as claimed by him. But we take even the general
rule, that natural and artificial objects control course and dis-
tance, to mean that they are to prevail when they are called for
in the deed, and when found to be inconsistent with the calls
for course and distance given in the deed. Now, the deed in
this case contained no calls for natural or artificial objects, un-
less the stakes and posts could be so considered. The only call
in the deed which, after the lapse of thirty or forty years, one
could expect to find, is that for course and distance. So that
course and distance are not only the most certain, but they are
the only call in the deed. And when the defendant seeks to
destroy the effect of these written muniments of title by parol
testimony, we submit that all the rules of law and common
sense require that he should prove, beyond a cavil, that the line
he claims was not only reputed to be, but, in fact, was the very
line run and marked at the time. In other words, there is no
discrepancy in the calls of the deed itself. Whatever discrep-
ancy is contended for by the defendant, arises on extrinsic
proof; no mountain, river, or spring, is called for in the deed;
no well-known line, not even a marked tree is mentioned; the
call for course and distance is the only guide furnished by the
deed; it was to that, and to that alone, that the parties in-
trusted the evidence of the rights and their agreement. And
we may well ask of the court to pause and consider, before per-

mitting their solemn written agreement to be set aside, upon rumors, as vague and loose as an alewife's gossip, about some other line, at variance with the calls in the deed, and made when, how, and by whom, is neither known nor plausibly conjectured.

In Anderson *v.* Stamps (19 T. R., 464), this court, per Wheeler, J., confirm the views we have urged, in a luminous opinion, from which we quote at length, inviting the attention of the court, however, to the whole opinion.   Judge Wheeler says: " The rules governing the construction of grants upon " questions of boundary are well settled.   They are invoked only " when the calls of the grant lead to contrary (conflicting?) re-" sults.   Then, those calls are to be adopted which are most con-" sistent with the intention apparent upon the face of the grant, " or the presumed intention of the grantor.   Hence the rule that " the most material and certain calls will control those which are " less certain and material ; because those are supposed to be " most prominent in the mind of the grantor ; and hence a call " for a natural object, as a river, a known stream, a spring, or " even a marked tree, will control course and distance.   The " lines of the survey as actually marked upon the ground, if they " can be found and traced, will control course and distance.   But " that is only when the actual survey can be found and identified " as the same called for in the grant.   It is not meant that when " the grant calls for certain known and established muniments " and boundaries, these may be controlled by parol proof of a " survey entirely inconsistent and repugnant to all the calls of " the grant.   No case has gone to any such extravagant length " as that.   That would be virtually to destroy the written evi-" dence of title, and substitute parol evidence in its stead."

And the court proceed to say that to disregard the most material call in the deed, and to mark and establish a corner elsewhere, " would be to contradict by parol the most material calls " of his grant.   It would not be to make one or more calls less " material and certain yield to other more material and certain, " but it would be to annul the most material and certain calls and

" boundaries by evidence of boundary less certain and material, " and in effect to contradict and annul the grant itself." And in Bass *v.* Mitchell, 22 T. R., 294, the same learned judge says : " If it had been proved that the corner was established " and known when the labors were granted, and if it had been " certainly found, and was found not to conflict with the other " calls in the deed, it would then have been a question whether " that or the other calls should govern, and there would then " have been occasion for the application of the rule that the calls " which are most material and certain shall prevail. But there " is no discrepancy in the calls in the deed    *    *    *; there " was, therefore, no uncertainty requiring a resort to rules of " construction."

So in Hickman *v.* Tait, Cooke, Tenn. R., 460, and in Frazier *v.* Basset, 1 Tenn. R., 297, the court say that course and distance will control where other means fail, or in the absence of any other means, which is the case here.

Courts have admitted parol evidence to depart from the calls of a grant with much hesitation, and have shown a disposition to limit it to evidence of the actual marking of the line by the surveyor at the time of the execution of the deed. Dallam *v.* Breckenridge, Cooke, Tenn. R., 152 ; and in 4 Humph. R., 205 ; and 1 Head, R., 60 ; the court say such evidence is only admissible when monuments were made or existed at the time, and that an unmarked line is not such a monument ; and merely tracing a line by the compass without marking can not establish such a line.· Dyer *v.* Yates, 1 Cold. Tenn. R., 136.

In Chenowith *v.* Haskell, 3 Pet. U. S. R., 96, Ch. J. Marshall says·: " It is an obvious principle that a grant must de- " scribe the land to be conveyed, and that the subject granted " must be identified by the description of it in the instrument " itself.    *    *    *    The description of · the land consists· of " courses and distances run by the surveyor, and of marked trees " at the lines and corners, or other natural objects which ascer- " tain the very land which was actually surveyed. The courses " and distances are less certain and less permanent· guides to the

" land actually surveyed and granted, than natural and fixed ob-
' jects upon the ground ; but they are guides to some extent,
" and, in the absence of all others, must control us. If a grant
" be made which describes the land granted by course and dis-
" tance only, or by natural objects not distinguishable from
" others of the same kind, course, and distance, though not safe
" guides, are the only guides given us, and must be used." And,
paraphrasing this language of our most eminent jurist, we may
say, that the plaintiff's deed describing the land granted by
calls for course and distance only, or by such unreliable objects
as "stakes" and posts, which are not distinguishable from
other stakes, nor susceptible of identification after any consid-
erable lapse of time, course, and distance, though not entirely
safe guides, are the only guides furnished, and must control us.

In Berkely v. Boreman, 2 Bibbs R., 493, Ch. J. Boyle says:
" When the lines and corners of a survey are found actually
" marked upon the ground, although they may vary from the
" courses and distances described in the patent, yet, if suffi-
" ciently identified, they constitute the true boundaries of the
" land appropriated by the patent; and although they may be
" defeated or destroyed, by design or accident, if their true
" position can be ascertained by oral testimony, the courses and
" distances must yield to them ; but notwithstanding the
" marked boundaries, while extant, or their true position, if
" ascertainable by witnesses, must control the courses and dis-
" tances, yet when they become extinct, and their position is
" no longer capable of proof by other means, the courses and
" distances become the only guides. In such a case the aid of
" both is necessary, for neither course without distance, nor
" distance without course, will lead to any definite object.
" When there is no conflict between course and distance there
" is no difficulty in the case. We must pursue them wherever
" they lead, and stop wherever they direct, without departing
" from either. * * * It is only from necessity, *ut res
" magis valeat quam pereat*, that a presumption of mistake,
" either of course or distance, ought to be indulged."

So Story, J., in Shipp *v.* Miller, 2 Wheat. R., 316 (4 Cond., 135), says: "It is a general rule that when all the calls of an "entry cannot be complied with, because some are vague and "repugnant, the latter may be rejected or controlled by other "material calls, which are consistent and certain. On this ac-"count, course and distance yield to known, visible, and defi-"nite objects. But course and distance do not yield unless to "calls more material and equally certain."

Appellant also insists that the charges of the court on the question of estoppel were calculated to mislead the jury, as they doubtless did. There was no evidence in the case to which they were pertinent. The charge wholly misconceives the doctrine of estoppel, and confuses the jury by leading them to suppose that it had some legitimate bearing on the case, and that there was evidence to which it was applicable.

The only facts to which these charges could have applied were the two partitions which had taken place, first, between B. Daughtry and his children, the heirs of his wife; and subsequently between the Daughtry heirs themselves, based upon a mistaken line and corner, which one of them (James Daughtry) pointed out to the surveyor. Two of the Daughtry heirs were minors still when this last partition was made in 1855; all of them were probably so at the first partition in 1849. It was a purely personal matter between themselves. Neither the defendant nor any one under whom he claimed was present, or knew of it, so far as the evidence shows. It is not pretended, we presume, that the Daughtry heirs were estopped by the neighborhood rumors, of which they, living in another county, never heard. So that the naked question is presented, whether the Daughtry heirs and the plaintiff, their vendee, are estopped from showing the true boundary line by their having previously made a partition among themselves on a mistaken line, without any evidence that they knew the true line at the time, or that the defendant did not know it, or that they intended to deceive him, or that he relied upon their acts

and was deceived thereby, or that he ever heard of them at all.

Unless we have wholly misconceived the doctrine of estoppel, this charge does so. As we read the authorities, fraud, either actual or constructive, is a necessary element of an estoppel. The party against whom it is proposed to apply the rule must have knowingly concealed his rights, and the party invoking the rule must have relied upon such fraudulent representations and been induced thereby to act.

Without drawing on the text books for authority, we content ourselves with tracing the decisions of our own courts upon the subject of estoppels:

In Barnett v. Poole, 23 Texas, 517, the facts relied on to create the estoppel were that the party, who was a citizen of Louisiana, had there gone into bankruptcy under the Bankrupt Law of the United States, of 1840; that he had inventoried the land on his bankrupt's schedule, and surrendered it to his assignee in bankruptcy, and delivered his muniments of title; that the land was sold by the assignee with his consent; that the plaintiff's vendor purchased at the assignee's sale, and that the assignee, with the bankrupt's consent, executed to the purchaser a title to the land, and, with a like consent, delivered up to him the muniments of title; that the sale was fairly made, the purchase-money was paid over and was distributed among the bankrupt's creditors; that neither the bankrupt nor any one claiming under him had ever afterwards set up any claim to the land; nor had they since paid the taxes thereon, but that the plaintiff's vendor had always paid them. The court after enunciating the general doctrine that the Bankrupt Law of the United States, and the proceedings under it had no extra territorial effect, and could not pass title to land in the State (then Republic) of Texas, proceed to discuss the question of estoppel, the court, Wheeler, J., holding the following language:

"It is an admitted doctrine that if a person having the legal "title to property, stand by and acquiesce in the sale of it by

" another person, having color of title, he will be estopped
" afterwards from asserting his title against the purchaser.
" This principle applies to personal property, in the transfer of
" which no technical formalities usually intervene to prevent
" its application ; and to real property where the vendor has
" color of title.    But if that were not wanting in the assignee
" of the bankrupt in this case, or be not material, there was
" wanting the deception, which is the ground of the estoppel."
(23 Texas, 320.)

In Moore v. Moore, 23 Texas, 637, the facts relied on to
create an estoppel against the plaintiffs, inquiring into the
minority of a testator, whose will they sought to set aside on
that ground, were, that the plaintiffs had repeatedly dealt with
the testator as a man of lawful age, and had in particular so
recognized him in the matter of partition and distribution of
estates, etc., etc.  The court say, " We see nothing in the acts of
" the plaintiffs to create an estoppel upon them to aver the
" truth as respects the age of the testator, and are of the opin-
" ion that the doctrine of estoppel has no application to this
" case."    (23 Texas, 639.)

In Lewis v. Castleman, 27 Texas, 407, the controversy arose
about the title to a negro, and the plaintiffs claiming under the
defendant's father, relied upon a letter of the defendant writ-
ten to a friend before the plaintiff's purchase, in which she
disclaimed any interest whatever in the negroes, and acknowl-
edged that her claim to them was merely nominal, that the
negroes were her father's, and never should be placed at any
one else's disposal ; that no one could take them from him, and
that she would never claim them.  In regard to this letter the
court, per Moore, J., say," The letter signed ' Lenora,' upon which
" Castleman relies as an estoppel of Mrs. Lewis' right to claim
" the negroes is wholly insufficient for this purpose.    An estop-
" pel, it is said, must be mutual : there is, and can be nothing
" of this sort here, or between the parties.    The act constitut-
" ing an estoppel *in pais* must have been acted upon.    There
" was not the slightest evidence to show that such was the fact ;

" * * * nor will the contents of the letter, if it is admit-
" ted that it has reference to the negroes conveyed to Mrs.
" Lewis by the deed from Caradine, and been seen by Castle-
" man before his purchase, authorize the conclusion that she
" was thereby estopped from asserting her title, or had relin-
" quished her claim to the negroes.    *    *    *    The letter
" cannot be relied upon as a relinquishment of her title, for
" want of a consideration to support it as such, if in other re-
" spects it was unobjectionable."    (27 Texas, 422.)

In Burleson *v.* Burleson, 28 Texas, 383, the defendants
claimed that the plaintiffs were estopped from setting up title
as heirs of their deceased mother to the land in controversy,
including the Lampasas Springs, by reason of their having been
present when their father sold the certificate and received the
purchase-money, that they asserted no interest in it, and silently
acquiesced in the sale.    In their verdict upon the special issues
submitted to them, the jury found the facts to be as stated.
The court, Smith, J., discussing the question of estoppel, say :
" The effect of an estoppel *in pais* is to prevent the assertion
" of an equivocal right, or to preclude a good defence, and jus-
" tice demands that it should not be enforced unless substantiated
" in every particular.    (12 Barb., 1287.)    The ground upon
" which the estoppel proceeds is fraud, actual or constructive, on
" the part of the person sought to be estopped.    What will
" amount to a suggestion of falsehood, or the suppression of the
" truth, may be difficult to determine in all cases ; but some tur-
" pitude, some inexcusable wrong, that constituted the direct
" motive, or induced the outlay or purchase, is necessary to give
" silence or acquiescence, the force of an estoppel *in pais.*
" Hence, ignorance of the true state of the title on the part of
" the purchaser must concur with wilful misrepresentations or
" concealment on the part of the person estopped.    If the real
" owner knowingly permit a third person to purchase property
" without notice of his claim from the apparent owner, he will
" be estopped from asserting his title against such innocent and
" *bona fide* purchaser.    (8 B. Monr., 539.)

" The true doctrine is well expressed in Story's Equity, Sec-
" tion 386; In order to apply an estoppel, it is indispensable
" that the party standing by and concealing his rights should be
" fully apprised of them, and should, by his conduct, or gross
" neglect, encourage or influence the purchaser; for if he be
" wholly ignorant of his rights, or the purchaser knew of them,
" or if his acts, silence, or negligence do not mislead or in any
" manner affect the transaction, there can be no just inference
" of actual or constructive fraud on his part. Rights can be
" lost or forfeited only by such conduct as would make it fraud-
" ulent and against conscience to assert them.

" If one act in such a manner as intentionally to make an-
" other believe that he has no rights, or has abandoned them,
" and the other, trusting to that belief, does an act which he
" otherwise would not have done, the fraudulent party will be
" estopped from asserting his right.   (5 Ired Eq., 255.)

" From these authorities, we are of the opinion that the
" plaintiffs and intervenors are not estopped from asserting any
" rights they may have in the premises, from any act, omission,
" or silence, proved on their part at the time the defendant,
" John Burleson, Jr., purchased the certificate from John Bur-
" leson, Sr.   It appears that he had full knowledge of the claim
" of the plaintiffs ; he was not deceived as to their rights ; they
" misrepresented nothing; they concealed nothing from him ;
" they did not disclaim their rights; nor did they in any way
" give him any reason to believe that they had or would aban-
" don any rights they then had.      *     *     *     It appears
" to us that the main groundwork of an estoppel *in pais* is
" wanting.   There was no fraud, actual or constructive, prac-
" ticed by the plaintiffs upon the defendant." (28 Texas,
416, 419.)

To the same effect is the case of Scoby *v.* Sweatt, 28 Texas,
713, where the plaintiff, claiming as forced heir under the old
law, sought to set aside the will of his ancestor, and the defend-
ants sought to estop him by showing that he had accepted the
legacies given him under the will: the court, by that enlight-

ened jurist, Chief Justice Moore, thus lay down the rule as to estoppels: .

"Still less reason is there for saying that appellant is es-"topped by the partition from contesting the validity of the "will. A much broader scope has been given of late in the "courts of England and this country to the doctrine of estop-"pel *in pais* than it formerly had. It is now well established "that whenever an act is done, or a statement made by a party, "which cannot be contravened without fraud on his part and "injury to others, whose conduct has been influenced by the "act or admission, the character of an estoppel will be attached "to what would otherwise be a mere matter of evidence, and "it will become binding upon a party, even in opposition to "proof of a contrary nature. But to constitute an equitable, "estoppel, the act or admission must be shown to have had a "direct or immediate influence upon the conduct of the party "claiming its benefit. (13 New Hamp. 360.) No such estop-"pel can arise without proof of wrong on one side, and injury, "suffered or apprehended, on the other, nor unless the injury "be so clearly connected with the wrong that it might and "ought to have been foreseen by the guilty party. (28 Maine "R., 525; 20 Conn. R., 90.) There must, unquestionably, "be some degree of wrong; for a statement innocent in itself "and susceptible of being withdrawn or contradicted, unless it "be made with the knowledge that it will, or may be acted on, "cannot be rendered binding by what subsequently occurs. "(2 Ell. and Blackb., 1; 3 Id., 48.) Estoppels *in pais*, said "Lewis, J., in Billings, Appeal, 5 Harris, 211, are well founded, "when confined to the legitimate purpose of preventing one "man from being injured by the acts or misrepresentations of "another. When no injury results from a misrepresentation, "its decision belongs to the forum of morals, and not to the "judicial tribunals. The connection between the wrong and "the injury should be direct and apparent, and such as to leave "no reasonable doubt that the former is the efficient cause of "the latter. For, as the effect of an estoppel is to prevent the

"assertion of rights unquestionably valid, or preclude defenses,
"which would otherwise be good, justice requires that it should
"not be enforced, unless sustained in every particular. (12
"Barb., 128.) In order, therefore, to raise an express or im-
"plied admission of one party from the rank of evidence to the
"dignity of an estoppel, it must not only be shown that its re-
"traction will be injurious to the other party, but that the in-
"jury results from the course of action induced by the admis-
"sion. Whatever, therefore, the degree of moral wrong on the
"one side and injury on the other, there will be no estoppel,
"unless the injury be the direct and natural result of the wrong."
(14 Mo., 482; 8 Gill, 230; 2 Smith, Lead. Cas., 644 *et seq.*;
28 Texas, 730, 731.)

Again, in Page *v.* Arnim, 29 Texas, 53, the facts relied on
as an estoppel against plaintiff were, that his ancestor had
acted as one of the appraisers of the estate of Wm. Chase, and
had appraised the land as a portion of said estate; that the
plaintiff was present at the sale by the administrator of Chase,
and made no objection thereto; that he lived in the county
some twenty years, and never made any claim to the land; that
the sale of the land was notorious in the county; and that the
defendants had paid the taxes ever since their purchase. Upon
these facts we have another of those luminous opinions of Chief
Justice Moore, which have placed him in the front rank of con-
temporary jurists. Referring to the foregoing decisions of
Burleson *v.* Burleson, and Scoby *v.* Sweatt, he says:

"In the first of these cases it was held that the tacit presence
"of the owner, and his knowledge of the sale, will not estop
"him, if the purchaser is otherwise informed as to the true
"state of the title. And in the second, it was decided that the
"acts from which the estoppel is claimed to spring, must have
"in some way induced or influenced the purchase; that the
"basis upon which such estoppel rests is actual or constructive
"fraud on the part of the owner, or such facts as would be tan-
"tamount to a fraud, if he were permitted to recover the
"property. The facts from which the estoppel is now claimed

" are altogether different from those then presented to the court;
" but the ingredients constituting a valid estoppel *in pais*, as
" defined in the instruction given to the jury in this case, cer-
" tainly fall far short of what was thought by this court to be
" its essential elements in those cases.

" There seems no reason to suppose that the appellant was
" any better informed as to the character and legal effect of the
" grant under which the administrator claimed and sold the
" entire league of land than the purchaser. If one was pre-
" sumed to know its legal effect, so is the other. The title
" showed the date of the grant. Knowing it to be community
" property, he was put upon inquiry as to the parties interested
" in it. If he was informed of appellant's interest, to have
" made it known to him at the sale would have furnished him
" with no additional information. If he did not know of it,
" appellant's presence at the sale could not have induced the
" impression of a waiver or abandonment of his title, and could
" in no way have induced the purchase.

" There are some cases, it is true, in which it has been held,
" that if the owner be present, and sees another purchasing
" with the erroneous belief that he is getting a good title, and
" he fails to make known his claim, he will be estopped from
" afterwards demanding the property. But upon a reference to
" the cases, it will generally be found that the facts show some
" additional sanction or encouragement of the purchase beyond
" the mere presence of the owner. (21 Me., 130 ; 28 Me., 128 ;
" 16 Me., 166.)

" The true rule seems to be, and with it goes the later and
" better considered cases, that the mere presence of the owner,
" if he have concealed no fact of which he was informed, and
" the purchaser could not have learned by the use of reasonable
" diligence, will not create an estoppel, unless the purchaser can
" show that he had reason to suppose, from the presence of the
" owner, that he sanctioned and acquiesced in the sale.

" In the case of Boggs *v.* Murced, 14 Cal., 367, Chief Justice
" Field says : It is undoubtedly true that a party will, in many in-

" stances, be concluded by his declarations or conduct, which " have influenced the conduct of another to his injury. The " party is said, in such cases, to be estopped from denying the " truth of his admissions. But to the application of this prin- " ciple, with respect to the trial of real property, it must ap- " pear, first, that the party making the admission, by his " declaration or conduct, was apprised of the true state of his " own title; second, that he made the admission with the ex- " press intention to deceive, or with such a careless and culpable " negligence as to amount to constructive fraud; third, that the " other party was not only destitute of all knowledge of the " true state of the title, but of the means of acquiring such " knowledge; and further, that he relied directly on such ad- " mission, and will be injured by allowing its truth to be dis- " proved.

" And in Hill v. Epley, 31 Pa., 334, it is said: It is only when " silence becomes a fraud that it postpones. And again : The " primary ground of this doctrine is, that it would be a fraud " in a party to assert what his previous conduct had denied, " when, on the faith of that denial, others have acted. The " element of fraud is essential, either in the intention of the " party estopped, or in the effect of the evidence which he at- " tempts to set up. (3 Hill, 222 ; 8 Barb., 102 ; 1 Seld., 394; " 11 Humph., 433 ; 19 Ala., 481 ; 7 Gill., 384.)

" The only qualification," adds Judge Moore, " which seems " necessary to the doctrine laid down in these cases is, that a " party may be estopped by acts and declarations which were " designed to influence another who has acted upon them, al- " though both parties were ignorant that what is thereby " represented is not true ; for if one of two innocent parties " must suffer, he through whose agency the loss occurred " should sustain it." (29 Texas, 70, 71, 72.)

In Reagan v. Holliman, 34 Texas, 403, the facts out of which it was claimed that the estoppel sprung were that Mrs. Rea- gan, who was a married woman, had executed a power of attor- ney to her husband, Joseph B. Reagan, under which he had

made a compromise with Lamar, under whom Holliman claimed, by which Lamar's title to the land was confirmed. That before purchasing from Lamar, the defendant had called on Mrs. Reagan, and she had disclaimed having any right, title, or interest in the land, and said she had no control of the same, and that it belonged to Lamar. The court, per Walker, Justice, after deciding that the power of attorney from Mrs. Reagan to her husband was void for the want of a privy examination, etc., and that the compromise made by her husband with Lamar was not binding because not made for the benefit of her separate property, etc., say : " The paper should not have been admitted " in evidence. It proved nothing to bind Mrs. Reagan; nor " is she estopped by it from setting up title to the land in con- " troversy; nor is she estopped by the declarations to Holliman, " if made in ignorance of her rights, and not intended to de- " ceive him ;" and the learned judge pithily remarks that Lamar " cannot take something for nothing through a court of equity " jurisdiction." (34 Texas, 412.)

It is in proof that under the verdict and judgment the plaint-iff loses some sixty or seventy acres of valuable land, which he had honestly bought and paid for ; and that the defendant gains so much over the quantity called for in his deeds. If he is permitted to hold it, it will be under the charge of the court in regard to the estoppel ; which precludes the plaintiff from showing the true line, because, forsooth, his vendors, in a friendly partition among themselves, while some, if not all of them, were minors, had mistaken the true line, although it was not in-tended to deceive, and so far as the evidence shows, did not deceive anybody ; and although there was no evidence that it induced the defendant to purchase, or that in fact he had ever heard of it. To permit it would certainly be to lend the aid of the court to enable him to get something for nothing, and, under a doctrine which is always odious, to strangle justice even at the altars which have been erected for her worship.

*Breedlove & Ewing,* for the appellee. The question of dis-

puted boundary involved in this case is one which has so often
been before this court for adjudication, that the laws governing
it are well settled and clearly defined; and an examination of
the charge of the court will show that the rules of law applicable
to controversies of this character were fully and clearly given in
charge to the jury, in conformity to the decisions of this court.
(Hubert v. Bartlett, 9 Texas, 97, and 21 Texas, 20; Bolton v.
Lann, 16 Texas, 96; George v. Thomas, 16 Texas, 74; Booth v.
Upshur, 26 Texas, 94; Booth v. Strippelman, 26 Texas, 436;
Wilder v. Hunt, 34 Texas, 44; Stafford v. King, 30 Texas,
271.)

Indeed, appellant concedes that the charges of the court con-
tain a correct statement of the general principles governing cases
of disputed boundary, but relies for a reversal of the judgment
upon the refusal of the court to give the first and third instruc-
tions asked by plaintiff. In support of the proposition em-
braced in the first of those charges, appellant cites several
authorities from our State Reports, which we shall briefly
notice: the case of McCown v. Hill, 26 Texas, 359, decides that
if a line had not been run and established upon the ground, then
course and distance would have to be resorted to; but that, if
the line had been run and marked, then such marked line must
prevail over calls for course and distance in determining the
extent of the grant. The case of Booth v. Strippelman, 26
Texas, 436, was one in which the grant contained a call by
course and distance for the corner and line of another survey
which had not been marked and established on the ground, and
the locality of which could only be ascertained by a survey; and
under these circumstances this court refused to permit the call
for course and distance to be controlled by the call for a stake in
an open and undefined line. But in this case, also, the court
decides that if the line of the other survey had been marked and
could be identified, then the call for course and distance must
have been disregarded. The case of Hubert v. Bartlett, 9
Texas, 97, cited by appellant, was a case in some respects simi-
lar to the one at bar. In that case, as in this, the line found

marked upon the ground varied materially from the calls for course and distance in the grant; and Justice Wheeler, in delivering the opinion of the court, lays down precisely the same rules as are stated in the instructions given to the jury in the case at bar. An examination of the authorities cited by appellant is all that is required to show that none of them support the proposition contained in the first charge asked and refused; but, on the contrary, that the general rules presented in the charge of the court below are consistently adhered to in the decision of each of the cases mentioned in appellant's brief. Whenever the lines of a survey could be found and identified upon the ground by natural or artificial landmarks, the conflicting calls for course and distance have always been disregarded; and it is only in those cases where course and distance afforded the only means of identifying the boundaries of a survey, that they have been resorted to. If the lines have not been run and marked, then course and distance must prevail.

But the first charge asked by plaintiff was properly refused, because all of that charge that was applicable to the facts of this case was embraced in the other instructions to the jury. In the second charge, given at the instance of plaintiff, the jury were instructed " that if it is impossible, from the death of witnesses, " the destruction of landmarks, or other causes, to determine " with certainty the true line by reference.to natural or artificial " objects, we must then rely on course and distance in order to " ascertain the true line." If, from the evidence, the jury were able to determine " with certainty " the true western boundary of the Roberts survey, by reference to the natural or artificial objects, then the other instruction, in regard to the doubtful identity of that line, was unnecessary, and could only have tended to confuse the minds of the jury. But this charge, as framed, is objectionable also, because it comments upon the weight of evidence. (P. D., 1464.) The idea conveyed by the language used is, that a line clearly defined in the deed by course and distance, will override the testimony of witnesses as to the

identity of natural or artificial objects, speaking from memory, after the lapse of many years.

As regards the refusal of the court to give the third instruction asked by plaintiff, it is sufficient to say that this charge was wholly inapplicable to the facts of the case.   There was no proof whatever that " Stephens sold to Roberts, and defined his west-" ern boundary line by calls for course and distance only, with-" out actually marking it upon the ground," but, on the contrary, there was abundant evidence that the line was actually run and marked upon the ground.   And in the general charge, and also in the special instructions given by the court at the instance of each party, the jury were frequently directed that the line which they were to identify and be governed by was the one which was run by the surveyor when Roberts purchased the one-third of a league from Stephens; and in one of the charges already referred to, they were required to identify this line " with certainty," by natural or artificial objects, or, failing in that, they must then resort to the calls for course and distance.   It would seem that these instructions, requiring, as they do, the strictest and most conclusive proof on the part of defendant as to the identity of the marked line (the yellow line on Buberstein's map), were as favorable to the plaintiff as the rules of law governing such cases would justify, but appellant is not content with this, but insists upon making this an exceptional case, and seeks to recover by reversing the well-known rules of the law, so as to make the " calls for course " and distance override" "the true" boundary line marked upon the ground " by natural or artificial objects."   And unless this can be done, the record shows that the plaintiff's case is a hopeless one.

Appellant argues also that lines marked by natural or artificial objects cannot prevail over course and distance, unless these objects are called for and described in the grant.   The effect of this argument, as applied to the case at bar, is that, because, in describing the land conveyed, the deed from Stephens to Roberts does not call for a line through the timber, marked

by blazes on the trees, that therefore the line actually marked upon the ground at the time of the survey must yield in case of conflict to the calls for course and distance. We have only to say in reply to this, that lines are not now, and never have been described in this way. Where a line is called for in a deed or the field-notes of a survey, a marked line is always intended and understood, the presumption of law being that the surveyor has done his duty in this respect. (Stafford *v.* King, 30 Texas, 257; Hubert *v.* Bartlett, 9 Texas, 103.)

Appellant also insists, in a supplemental brief, that the court erred in instructing the jury upon the subject of estoppel, and while conceding the correctness of the legal proposition contained in the charge, insists that it was not applicable to the facts of this case. Appellant seems to think that this charge could only apply to the fact that James Daughtry, acting for himself, and as agent and guardian of his brothers and sister, pointed out this marked line as the western boundary of their land. It is true this was one act, but not the only or principal one by which the defendant, and those whose title he holds, were induced to believe that the yellow line was the true boundary. The fact that for a period of twenty-four or twenty-five years (from 1838 to 1862), Elisha Roberts, the Daughtrys, and W. W. Browning held possession of the Roberts third of a league, knowing of the existence of the marked line, and during all that time made no claim to any other, but on the contrary recognized and claimed such marked line (the yellow line on Buberstein's map) as the true and only western boundary of their land, is another and still stronger reason why they should not now be permitted to come into court, and seek the correction of the mistake (if it was a mistake) in the survey. Having remained silent for so many years, and during the time having permitted the defendant, and those under whom he holds, to purchase the lands adjoining that marked line, in utter ignorance of their adverse claims, equity requires that they remain silent, and will not now suffer them to insist upon rights which,

if they ever existed, they have ignored for so long a time. Plaintiff cannot plead ignorance of the fact that the marked line does not conform to the calls for course and distance in the deed from Stephens to Roberts, because that conveyance was all the time in the possession of those claiming under it, and the marked line was well known, not only to the parties at interest, but to the whole neighborhood, and the fact that there was a variance between the calls in the deed and the line, as plainly marked upon the ground, should have been, and no doubt was, well known to them long before the institution of this suit. The appellant, and those under whom she holds, having recognized and acknowledged this plainly marked line for so many years, in a manner so notorious as to induce the public to believe that it was their true line, and thus inducing and permitting the defendant, and those through whom he deraigns title, to purchase in confidence that such marked line was their true boundary, are now estopped from setting up a claim to any land beyond that marked line. To use the language of Justice Wheeler, in the case of George v. Thomas, 16 Texas, 91: "In a word, plaintiff has not shown the pre- "tense of a right to come in at this late day, and, under a re- "cent purchase, to disturb the peace of the neighborhood, and "unsettle landmarks and boundaries that have been estab- "lished and acquiesced in for nearly a quarter of a century. If "suits of the character of the present were encouraged, the "mischiefs to which it would lead may readily be conceived, "and, indeed, would be of serious consequence. But, fortu- "nately for the peace of society, the well-settled principles of "law, no less than reason, justice, and sound policy, forbid the "courts to encourage or countenance by their sanction preten- "sions so adverse to private rights and the public tranquillity. "It is clear beyond controversy that the dividing line or bound- "ary had been run, established, and acquiesced in by those "under whom plaintiff claims long before the institution of this "suit. It was well known to plaintiff, as is shown by the evi- "dence, which not only disproves the gravamen of her com-

42

" plaint, but made out and established, incontestably, the case " of the defendant."

The charge, as given, was a correct statement of the law on the subject of estoppel, applicable to the evidence in the case · at bar, but we know we are fully sustained by the record, when we assert that this case was not determined upon that ground, and that the verdict of the jury was not influenced by that charge. The verdict of the jury was based upon the evidence as to the identity of the marked (yellow) line with the true western boundary of the Roberts survey. The testimony of the witnesses so fully and conclusively established the fact that the marked line is the true boundary as to leave upon the minds of the jury no shadow of doubt as to the identity and genuineness of that line. In view of all the facts and circumstances in evidence, all tending to this conclusion, and admitting of no other, the finding of the jury could not have been otherwise than " for the defendant." " What are boundaries, " is matter of law ; where they are, is matter of fact ; and it is " a matter of law which juries cannot control, but which must " control them, that where the lines of a survey have been run, " and can be found, they constitute the true boundaries which " must not be departed from, or made to yield to course and " distance, or to any less certain and definite matter of descrip- " tion or identity." (Bolton v. Lann, 16 Texas, 112.)

WALKER, J. In this case both parties deraign title from a common source. The question is one of boundary, and the purpose of the suit is to settle the western boundary line of the tract of land sold by Stephens to Roberts, the plaintiff's vendor.

The only question material for our consideration grows out of the charge of the court, and the refusal to charge as asked by the plaintiff's counsel. Considering the evidence in this case, the first and third charges as asked by plaintiff's counsel should have been given. It will not do for the court to confine itself to abstract principles and attempt to apply them to

every case ; for almost every case presents some new feature, to which principles which might well apply and be regarded as sound law in other cases have no application at all. The charges to which we refer, as being refused by the court, are as follows :

"*First.* A line clearly defined by calls for course and dis-" tance will override an uncertain line, based on the doubtful "identity of natural or artificial objects ; the true rule being "that the most certain and reliable evidence, all things con-" sidered, shall have the greatest weight : " and

"*Third.* If you believe from the evidence that in 1834, "Stephens sold to Roberts one-third of a league of land, and "defined his western boundary line by calls for course and dis-" tance only, without actually marking it upon the ground, the "parties to whom Stephens afterwards sold by deeds calling "for Roberts' western line, would be bound by that line as de-" fined in Roberts' deed."

Where natural objects, monuments, or marked lines, are not called for in the deed, or are of doubtful identity, calls for course and distance may then be resorted to as furnishing the best evidence of which the case is susceptible. A call for a line not marked will not control course and distance. (Houston *v.* Pillow, 1 Yerger, 488 ; Martin *v.* Vance, 3 Head., Tenn., 649 ; Boarman *v.* Cox, Peck, Tenn., 364.) This doctrine is perhaps carried farther in Booth *v.* Upshaw, 26 Texas, 70, than in the Tennessee cases. Judge Roberts, in delivering the opinion of the court, says : "There is no law fixing the effect of any "call found in a grant, or giving one more weight than another." This rule is sufficiently explained in the opinion. In Hubert *v.* Bartlett, 9 Texas, 103, Judge Wheeler undoubtedly states the correct rule as "where the calls lead to conflicting results "that must be adopted which is most consistent with the intent "apparent on the face of the grant; hence there are many "cases where course and distance will control natural marks "and boundaries." This rule was followed in McCown *v.* Hill, 26 Texas, 359, and in Booth *v.* Strippelman, 26 Texas, 440, and it has been followed in subsequent cases.

It is only where lines are actually marked, and where they can be identified, that they control course and distance. This rule is laid down in several Pennsylvania cases, and in 6 Peters, 508; 4 Wheaton, 444; 4 Cond. R., 501; and 4 McLean, 279.

There is one other question raised in this case, on the doctrine of estoppels *in pais*. This question, however, has little to do with the case at bar. We are unable to discover how the action of the Daughtry heirs, in making an amicable partition among themselves, could affect any of the parties to this suit. They did not assume to determine that the yellow or pink line, marked upon the map, was the true western boundary line of their land; they assumed the yellow line for the purpose of partition, all parties being alike affected (as it would seem), whether the yellow or the pink should be found to be the true line. But one essential ingredient in the doctrine of estoppel *in pais* is that of fraud, which does not enter into this case. The judgment of the District Court must be reversed and the cause remanded.

Reversed and remanded.