**FINDLAY et al. v. STATE.   (No. 6386.)**

(Court of Civil Appeals of Texas. Austin. Dec. 9, 1921. Rehearing Denied March 8, 1922.)

1. **Public lands ⚖➠176(2)—Sale of lands for construction of capitol held by the acre and not in gross.**

Under Const. art. 16, § 57, appropriating 3,000,000 acres of public land for the construc-

tion of a capitol, and the acts of the Legislature in providing for the survey of that quantity of land with only enough additional to pay for the cost of the survey, and the contract between the state and the contractor, who agreed to construct the capitol for 3,000,000 acres of land to be patented to him in numerical order of the leagues as surveyed during the course of the work, the transaction constituted a sale of the lands by the acre and not in gross.

2. **Public lands ⚖➠176(2)—Construction by parties held to show sale of capitol lands was not in gross.**

The subsequent contract between the state and the contractor for the construction of the capitol, after it was discovered that a portion of the capitol lands as surveyed was in the territory of New Mexico, and that other portions of the survey contained excesses, that the contractor should be reimbursed for the land in New Mexico from the excess lands discovered in the surveys of other leagues, was a construction by the parties that the original contract was a sale of the land by the acre and not in gross.

3. **Vendor and purchaser ⚖➠65(2)—Modern tendency is to construe sales of land as by the acre.**

The modern tendency is to construe the sale of lands to be by the acre and not in gross.

4. **Vendor and purchaser ⚖➠176—Parties to sale in gross assume hazard as to excess of deficiency.**

The ground upon which equity refuses relief with respect to the quantity of land sold, where the sale is in gross, is that each party takes the hazard in reference to the quantity, and the purchaser's hazard of a loss is the consideration he pays for the excess.

5. **Public lands ⚖➠176(2)—Subsequent contract held to show parties did not accept original determination of acreage.**

The second contract between the state and the contractor for the capitol, whereby the contractor was to receive, in place of the lands originally designated in the capitol survey which were found to be in New Mexico, the excess of lands discovered in the surveys of some of the other leagues, was a construction by the parties that the original contract for the transfer of the lands did not intend that the determination of the acreage by the surveys theretofore made was conclusive upon the parties.

6. **Partition ⚖➠14—Vendor and purchaser ⚖➠164—Equity will relieve against material excess; seller may be allowed partition.**

Where a material excess of land has by mutual mistake been included in a grant, equity will require the purchaser to pay therefor or give the seller the right to partition if the land is susceptible of equitable partition, and if the excess is large, equity will grant the relief even though the sale is in gross, but a much less excess will afford ground for relief where the sale is by the acre.

---

**7. Public lands ⊚⟹177—Excess of 55,000 acres in sale of 3,000,000 acres held material.**

An excess of 55,000 acres in the 3,000,000 acres of capitol lands patented to the contractor, or 1.8 per cent. of the total acreage, is sufficiently material to entitle the state to equitable relief, since the percentage of excess is not the only factor to be considered, and since it is not to be presumed that the Capitol Commission, composed of the Governor, the Attorney General, the Comptroller, the Treasurer, and the Commissioner of the Land Office, had any intention to exceed the limitation imposed by the Constitution as to the acreage which they could convey.

**8. Corporations ⊚⟹619—State held entitled to recover excess of capitol lands from trustees of corporation which took all the lands.**

Where the contractor for the state capitol transferred the lands received by him under his contract to trustees who sold portions of it to pay the indebtedness of a corporation formed to acquire the lands, and transferred the rest of the lands to the corporation, which, after selling a large part of the land and distributing the proceeds to its stockholders, conveyed the rest of the lands to trustees to sell and distribute to the stockholders of the corporation which then dissolved, the last trustees are in effect the corporation which received the benefit of all the lands conveyed to the contractor, and the state can recover from them the excess included in the surveys of the land, which was much less than the land still remaining in the hands of the trustees.

**9. Corporations ⊚⟹619—Substantial change in stockholders held not to prevent recovery against trustees of corporation after dissolution.**

The fact that there had been a substantial change in the stockholders of the corporation which received the lands conveyed to the capitol contractor does not prevent recovery from the trustees for that corporation, after its dissolution, of the excess in the surveys of the lands so conveyed, since the corporation, and not its stockholders, was the owner of the land, and even disregarding matters of form, the trustees for the present stockholders were the owners of the land the recovery of which was sought by the state.

**10. Public lands ⊚⟹176(2)—Statement of facts held to show defendants' predecessors received all of the capitol lands.**

An agreed statement of facts that the capitol contractor, as he received patents for the capitol lands conveyed them to the predecessors of defendants, shows that such predecessors received all of the capitol lands, notwithstanding evidence that the contractor exchanged a portion of the lands with others, where there was no evidence that the predecessors of defendants did not receive the benefit of the exchange.

**11. Appeal and error ⊚⟹1054(1)—Qualification of bill of exceptions held to show hearsay evidence was not considered.**

An assignment of error to the admission of hearsay evidence to identify a surveyor's field book in a suit tried to the court is not sustained, where the trial judge qualified the bill of exceptions by stating that he disregarded the hearsay evidence and admitted the book upon other evidence relating thereto, which was competent and sufficient for that purpose.

**12. Evidence ⊚⟹333(5), 341—Reports of county surveyor filed in land office and certified copies thereof admissible.**

A report made by a county surveyor as agent of both the state and the capitol contractor to correct mistakes in the original survey of the capitol lands, which report was filed in the Land Office, was an archive of the Land Office, and either the original report or certified copy thereof was admissible under Rev. St. art. 3694.

**13. Evidence ⊚⟹83(1), 89—Presumption of actual survey is based on presumptions that officers do their duty and is rebuttable.**

The presumption that an actual survey was made on the ground is based on the presumption that public officers do their duty, and prevails only in the absence of evidence to the contrary, and not against evidence of circumstances showing that such survey was not made.

**14. Public lands ⊚⟹175(5)—Facts held to show surveyor did not run lines to another tier of survey.**

Where the surveys of the capitol lands, all of which were made under one contract, showed that the lines of one tier of surveys, when run for the prescribed courses and distances from identified beginning points, failed to meet the north line of the tier next on the south which they were called to meet, and the theory that the two tiers were surveyed by the same surveyor who actually located a line of the south tier in running the lines of the northern tiers could only be accepted on the assumption that he made a mistake of exactly the same quantity in running each north and south line, and that he made a consistent error of 16 degrees in the direction of such lines, and made some of the surveys of that tier encroach upon others in the same tier, the presumption that he actually ran the lines of the southern tier, whether it was the same surveyor or a different one, is rebutted.

**15. Boundaries ⊚⟹3(5)—Supposititious call on erroneous belief as to location of object does not prevail over call for course and distance.**

A supposititious call in a survey, made on an erroneous belief as to the location of the object called for, will not prevail over a call for course and distance, whether the survey was actually made on the ground or was an office survey.

**16. Boundaries ⊚⟹3(5)—Call for line of surveys, inserted under erroneous belief as to location, held not to control calls for course and distance.**

A call in field notes inserted by mistake will be rejected, and the survey constructed as though such mistaken call had not been inserted, so that a call for the line of another tier of

surveys inserted under an erroneous belief as to where that line was located without actually running the line on the ground does not control calls for course and distance.

**17. Public lands ⊜⇒175(5)—Contract to one surveyor does not establish that he did all the field work.**

The fact that the survey of all of the capitol lands was made under one contract let to one surveyor does not show that that surveyor did all the work in the field, or, in fact, that he did any of it.

**18. Public lands ⊜⇒175(7)—Substitution of second survey by agreement renders original survey immaterial.**

After the parties to the contract for the grant of the capitol lands in exchange for constructing the capitol had agreed to abandon the original survey which included some lands located in New Mexico and to substitute therefor the excess lands contained in the other leagues of the original survey as shown by a subsequent survey, it was immaterial what lands were included in the original survey of those leagues,. since they had been abandoned, and the parties were governed by the second survey.

**19. Public lands ⊜⇒175(5)—Facts held to show surveyor did not run lines of another tier of surveys called for by him.**

In a suit by the state to recover a vacancy between two tiers of survey of the capitol lands, where findings supported by the evidence showing that the lines of one tier of surveys extended to the north line of the tier next on the south, as called for by the surveyor's field notes, could be adopted only on the assumption that the surveyor made the same mistake in measuring· four different north and south lines, it must be accepted that the surveyor did not run the lines of the south tier, but merely̒made his call based on an assumed location of such lines which was incorrect.

**20. Boundaries ⊜⇒3(5)—Call for natural or artificial object does not always prevail over course and distance shown to be more reliable.**

A call for an artificial object, or even for a natural object, will not necessarily control a call for course and distance if all the facts and circumstances show that the call for the distance is the more reliable.

**21. Boundaries ⊜⇒3(7) — Unmarked prairie line of another survey called for in field notes is artificial object within preference rule only if actually run by surveyor.**

·An unmarked prairie line of another survey, called for by the field notes, is an artificial object within the rule giving preference to such call only if the surveyor had actually run such line so as to render it visible to him.

**22. Boundaries ⊜⇒33—Presumption surveyor ran lines called for depends on circumstances.**

Whether it ought to be presumed that a surveyor ran out an unmarked prairie line called for in his field notes depends upon the proximity of marks ′or lines from which such line could have been run, and such presumption is very weak if it would have been difficult to find any marked corners from which to run the line.

**23. Boundaries ⊜⇒3(2)—Prevailing intention of surveyor must be determined from conflicting expressed intention.**

The rule that the intention of the surveyor controls the location of the survey does not aid in determining the boundary, where the intention as expressed in·the survey is conflicting, in which case the prevailing intention must be determined under the rules relating to boundary.

On Motion for Rehearing.

**24. Public lands ⊜⇒176(2)—Entire acreage of capitol lands was consideration for entire .construction of capitol.**

Under the contract for the construction of the state capitol, the patents to portions. of the capitol lands issued from time to time to the contractor were not separable considerations for the work theretofore done by the contractor, but the entire grant of lands was the consideration for full performance of the contract, and, in the event of breach by the contractor, he would have held the ·title to the lands previously patented to him in trust for the state, so that the excess of the lands which was distributed through a great many of the different leagues is not to be recovered only from the lands last patented to the contractor.

**25. Public lands ⊜⇒177 — State can ratify subsequent sales of capitol lands containing excess, and have partition from contractor's balance.**

The state could ratify the sales made by the successor of the capitol contractor of portions of the capitol lands containing excess acreage, and recover from such successors the total amount of excess in all the surveys to be partitioned out of the land still owned by the successors.

**26. Partition ⊜⇒26—Vendor and purchaser ⊜⇒164—Purchaser receiving excess must show equity and tender payment to defeat partition.**

To entitle a purchaser of land, who. received an excess over the acreage agreed upon, to retain the excess by paying its value, he must show an equitable right to retain such excess and tender payment of its value, and, in the absence of a tender of such payment, the court properly directed equitable partition of the land without giving the option to pay for the excess.

**27. Public lands ⊜⇒177—Vacancies in capitol lands held recoverable ̇from contractor's remaining lands.**

Where the immediate successors of the contractor for the state capitol in ownership of the capitol lands still retained enough of the lands to make good the entire excess of actual acreage over that agreed to be patented to the contractor, and transferred by him to the successors, including the amount of vacancies between certain of the surveys, the state will

⊜⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

be given the amount of such vacancies from the lands remaining in the hands of the successors, which was of substantially equal value, and the purchasers of the lands containing the actual vacancies permitted to retain them.

Appeal from District Court, Travis County; George Calhoun, Judge.

Three suits by the State against George Findlay and others, consolidated for trial. Judgment for the plaintiff in each suit, and defendants appeal. Judgment in the first suit reformed and affirmed, and judgments rendered for defendants in each of the other two suits.

I. W. Stephens, of Fort Worth, and Horace Kent Tenney and Geo. T. Rogers, both of Chicago, Ill., for appellant Findlay and others.

Madden, Trulove, Ryburn & Pipkin, of Amarillo, for appellant Landergin and others.

Veale & Lumpkin, of Amarillo, for appellant Bivins and others.

I. H. Burney, of Fort Worth, and G. E. Hamilton, of Matador, for appellant Matador Land & Cattle Co.

C. M. Cureton, Atty. Gen., E. F. Smith, Asst. Atty. Gen., and G. B. Smedley, of Austin, for the State.

Nature and Result of the Suit.

JENKINS, J. The state of Texas brought suit No. 36183, in the district court against George Findlay, Francis C. Farwell, and Hobart C. Chatfield-Taylor, to recover an alleged excess in a great number of surveys in a number of counties in the Panhandle of Texas, which were patented to Abner Taylor, in payment for the building of the present state capitol. The allegation in this regard is that by mutual mistake excesses were included in said surveys aggregating 55,116 acres, and that the state is the owner of an undivided interest in the entire tract to the extent of said excess, and entitled to possession of same; that Taylor and his assignees have conveyed a large portion of said land, but that the said Findlay, Farwell, and Chatfield-Taylor still hold the legal title to about 600,000 acres of same as trustees, out of which the state seeks to have the portion to which it is entitled set apart to it. Numerous issues of law are raised by the pleadings. The state also brought two separate suits against some of the appellants herein, to recover alleged vacancies between certain of the capitol league surveys. All of those suits were consolidated, and tried before the court without a jury, with the result that judgment was rendered for the state, both upon the issue of title involved in the first suit and upon the issue of boundary involved in the other suits. All of the defendants have appealed.

We think it will avoid confusion, if we treat the issue of title involved in the parti-

tion suit and that of boundary in the other suits separately.

The court filed its findings of fact, which we think, for the most part at least, are sustained by the evidence. They cover 5 pages, which are not unduly long, in view of the fact that the statement of facts, besides the numerous maps, covers 1,194 pages. However, with the view of stating them in their logical order, we make, as to the partition suit, the following

Findings of Fact.

(1) The Constitution of 1876 contained the following clause:

"Three millions acres of the public domain are hereby appropriated and set apart for the purpose of erecting a new state capitol and other necessary public buildings at the seat of government, said lands to be sold under the direction of the Legislature; and the Legislature shall pass suitable laws to carry this section into effect." Art. 16, sec. 57.

(2) In obedience to this command of the Constitution, the Legislature, on February 20, 1879 (Gammel's Laws, vol. 8, pp. 1309, 1310), passed an act which set apart for the purpose of erecting the capitol all of the vacant land in a number of counties in the Panhandle of Texas; created a board to have the same surveyed into league surveys to the amount of 3,050,000 acres, not to include in such surveys any land not fit for agriculture or grazing purposes, after which the remaining lands in said counties should cease to be subject to the reservation created by the act. The 50,000 acres were to be sold, one half of the proceeds to go to the school fund, and the other half to the payment of expenses in surveying the land.

(3) On April 18, 1879 (Gammel's Laws, vol. 8, pp. 1412, 1414), the Legislature passed an act creating a board of commissioners, to let the contract to build the capitol, to the bidder who would agree to build the same "for the smallest amount of the said public domain so set aside" for building the capitol, and appropriating the 3,000,000 acres to be surveyed, or so much thereof as might be necessary to that purpose.

(4) On June 28, 1879, the Capitol Commissioners made a contract with J. T. Munson to survey in league surveys 3,050,000 acres of land in said reservation.

(5) On January 28, 1881, the Commissioner appointed to supervise the surveying, reported that the same had been completed, showing in detail what lands had been surveyed, and that the field notes had been returned to the Land Office.

(6) The Commissioners advertised for bids for building the capitol. On December 31, 1881, Mattheas Schnell submitted a proposition "to build the New Capitol Building, according to plans and specifications, for 3,000,- 000 acres of land, as designated in your no-

tice to contractors, dated July 1, 1881." This bid was accepted by the Commissioners, January 10, 1882.

(7) The contract provided that the contractor should receive title to the lands as the work progressed, beginning with league No. 1, and taken in numerical order.

(8) On January 31, 1882, Schnell assigned three-fourths of his contract to C. B. Farwell, John V. Farwell, Abner Taylor, and A. C. Babcock, and on May 9th the remainder of said contract was assigned to said parties by Schnell. On June 30, 1882, Babcock and the Farwells assigned their interest in the contract to Abner Taylor.

(9) The state accepted Taylor as the contractor instead of Schnell, and the Farwells and Babcock signed his bond as sureties, for the faithful performance of said contract.

(10) On April 16, 1888, the Capitol Board adopted a resolution to the effect that, whereas, the Commissioner of the Land Office had reported that errors had been discovered in the survey of the capitol reserve lands, and that by agreement with the contractor a partial resurvey had been made by W. S. Mabry, from which it appeared that about 16,000 acres of said survey were in New Mexico, and that excess in some of the league surveys had been discovered sufficient to make up for the land lost by reason of the conflict with New Mexico, therefore the corrected field notes as made by Mabry were adopted; that the excess discovered in some of the leagues had been taken out, and the said leagues had been reduced to their proper size, and the excess from same placed in new league surveys, numbered 333½, 345½, and 357½, to be awarded to the contractor in lieu of the lands in New Mexico; and that the supplemental contract of January 11, 1887, with reference to this matter, was ratified.

(11) Certificates were issued to the contractor from time to time, as the work progressed, showing that he had earned, and was entitled to have patented the number of acres mentioned in such certificates, beginning with Survey No. 1. Prior to June 1, 1885, such certificates had been issued, aggregating 199,260 acres. Other certificates were issued from time to time amounting in the aggregate to 3,000,000 acres. Patents were issued to Taylor for this amount of land.

(12) On August 25, 1888, the Capitol Commissioners certified that the capitol had been completed according to contract.

(13) On or about June 1, 1885, Abner Taylor contracted to convey all of the lands earned and to be earned by him under his contract to the Capitol Freehold Land & Investment Company, Limited, then in process of organization in Great Britain, in consideration of stocks and debentures of said company.

(14) In compliance with said contract, Taylor, joined by C. B. and J. V. Farwell, con-

veyed said lands to trustees, who were authorized to sell any or all of said lands to pay the debentures issued by said company, and thereafter to convey the remainder to said company. Prior to this Babcock had conveyed his interest to the Farwells.

(15) Said original trustees conveyed portions of said land to various parties, and, after paying off said debentures, conveyed the remainder of said lands to the said company, hereinafter referred to as the Capitol Company.

(16) The Capitol Company sold to various parties portions of said land, and, on June 4, 1915, conveyed the remainder thereof to George Findlay, Francis C. Farwell, and Hobart C. Chatfield-Taylor, appellants, in trust for the purpose of selling said lands and liquidating the affairs of said corporation, then in process of dissolution, and which has been dissolved as provided by the laws of Great Britain. But said trustees are still in possession of the unsold portion of said lands, amounting to about 600,000 acres, being the land described in Schedule X of appellees' petition.

(17) There is an excess in the lands patented to Taylor of 55,089 acres, arising from the fact that many of said surveys, as found to exist upon the ground, contain excesses. These excesses are not confined to any one survey, or to any one county, but exist with tolerable uniformity throughout all of the surveys.

(18) It was the purpose of the state to convey, and of the contractor to receive, full 3,000,000 acres of land for constructing the state capitol, and no more. Both the state and the contractor believed, when the patents were issued, that such patents conveyed the number of acres called for therein, and no more. That said patents do in fact contain more land than is shown upon their faces, arising from a mutual mistake on the part of both parties to the contract.

(19) The state, by bringing this suit, and by the allegations in its petition, has elected to ratify the sales of the portions of said lands which have been sold, as set forth in the foregoing findings of fact, and to claim its undivided interest in the lands now held by the trustees, Findlay et al.

(20) The lands now in the possession of the trustees are more than sufficient to satisfy the claim of the state to the excess, if any, to which it is entitled, and are susceptible of an equitable partition being made of the same between the state and said trustees.

## Opinion.

It is the contention of appellee that, by reason of the constitutional provision set out in our findings of fact, the Legislature was without power to grant more than 3,-000,000 acres of land for the purpose of build-

ing the state capitol. We need not decide this issue, inasmuch as, whatever power the Legislature may have had in the premises, it never in fact granted, or authorized the granting of, more than that amount of land for that purpose, unless the patentee, by reason of the sale being in gross, is entitled to the subsequently discovered excess in the surveys.

[1] It is the contention of the appellants that, even if the officers authorized by the Legislature to contract for the building of the capitol had no power to knowingly grant more than 3,000,000 acres, yet, if the sale was in gross of an entire tract, supposed to contain only 3,000,000 acres, there being no fraud in the transaction, the grantee and his assigns are entitled to the excess. We are not called upon to determine this point, for the reason that the same is not raised by the facts herein. As found by the trial court and by this court, the sale was not in gross, but was a sale by the acre. Our reasons for so finding are briefly these:

(1) The Constitution set aside for the purpose of building a new capitol 3,000,000 acres of land and no more. Though this may not have been a limitation on the power of the Legislature, it was, at least, an expression of opinion on the part of the framers of the Constitution, and of the people who adopted it, that this was a sufficient amount for that purpose, and we would expect that the Legislature would attempt to secure the building of the capitol for an amount of land not exceeding 3,000,000 acres.

(2) This the Legislature did by temporarily reserving from location all of the public lands in certain counties until 3,000,000 acres thereof, and no more, could be surveyed, to be used in the erection of a new capitol building.

(3) This Commission appointed by the Legislature to carry into effect the provision of the Constitution referred to, contracted for a survey of 3,000,000 acres, and no more, for this purpose; the 50,000 additional acres being for another purpose.

(4) The field notes returned to and filed in the Land Office showed that the surveys aggregated only 3,050,000 acres; the 50,000 acres to be used in paying for making the survey.

(5) The bids advertised for were for the smallest quantity of the 3,000,000 *acres* for which the bidder would erect the capitol; or for the least number of acres for which he would erect certain specified portions of same.

(6) Schnell's bid was that he would complete the building for *3,000,000 acres.* We attach no importance to the fact that his bid was to erect the building for "three million acres of land as designated in the notice to contractors." This merely served to indicate the location of the land, as distin-

238 S.W.—61

guished from any 3,000,000 acres that the state might choose to give him.

(7) That this is a correct interpretation of Schnell's bid is shown by the fact that the contract made with him, in pursuance thereof, as construed by our Supreme Court, in Taylor v. Robinson, 72 Tex. 368, 10 S. W. 245, was not the sale of any land to Schnell, but only gave him the right to earn a *specified number of acres,* from time to time, as the work progressed. Had Schnell only partially completed the building, he would have been entitled to a certain number of acres out of the 3,000,000 acres surveyed, beginning with survey No. 1 and continuing in their consecutive order.

(8) Subsequent to Taylor becoming the assignee of the contract with Schnell, it was discovered by a survey made by Mabry that there were certain errors in Munson's survey, namely, that there was a conflict with New Mexico, to the extent of about 16,000 acres, and that there were excesses in 88 leagues, aggregating 3 leagues. The effect of the action of the parties by reason of these facts was that Taylor demanded that the shortage by reason of such conflict be made good, to which the state assented; and the state demanded the discovered excess, to which Taylor assented. Consequently the field notes of the excessive leagues were corrected, reducing them to their proper quantities; and out of the excess thereof were created three new leagues, with numbers not included in the original contract, which Taylor received in satisfaction, pro tanto of his loss occasioned by such conflict. If Taylor had construed the contract as a sale in gross, he certainly would not have consented that his loss by reason of the conflict with New Mexico should be compensated by granting him land that was already his, or would be his when he completed his contract.

[2] The supplemental contract occasioned by the discovery of the conflict and the excess, after granting Taylor the three new leagues, contained this clause:

"It is, however, distinctly understood by and between the parties hereto that this contract does not convey any land in excess of the three million acres agreed to be conveyed in the original contract for building the new capitol."

The practical construction given to a contract by the parties thereto may be looked to in case of doubt to ascertain its meaning. Railway Co. v. Johnson, 74 Tex. 263, 11 S. W. 1113. Such construction is entitled to great weight as against a party who has thus construed the contract against his interest. Railway Co. v. Adams, 87 Tex. 131, 26 S. W. 1040. If we were in doubt as to whether the sale was in gross or by the acre, the action of Taylor as above set out would be sufficient to cause us to resolve the doubt against appellants.

[3] The tendency of modern decisions is to

construe sales of lands to be by the acre. Such, in fact, they generally are.

[4] The ground upon which equity refuses relief as to quantity, where the sale is in gross, is that each party takes the hazard in reference thereto. "His [the purchaser's] hazard of a loss is the consideration he pays for the excess. If that consideration be wanting, he must rely on his express contract, if he would claim an excess." O'Connell v. Duke, 29 Tex. 314, 94 Am. Dec. 282. The conduct of the parties, as hereinabove set out, shows that neither party intended to take any hazard as to quantity.

[5] It is the contention of appellants that, even though the contract should be construed to be a sale by the acre, the acreage was to be ascertained in the usual manner, that is to say, by a survey, and that, inasmuch as the land had been surveyed when the contract was made, there being no fraud in the transaction, and as the excess is small in comparison with the total acreage, it should be held that it was the intention of the parties to the contract that acreage was to be determined by the amounts shown in the surveys theretofore made.

The parties did not so construe the contract. On the contrary, by agreement, 88 of said surveys were resurveyed by Mabry, and their field notes were amended so as to include just 1 league each, and the excess found in said leagues was conceded to belong to the state.

[6] It is well settled that where a material excess has, by mutual mistake, been included in a grant, equity will give relief by decreeing that the purchaser must pay for the excess, or the seller will be entitled to partition, if the land be susceptible of equitable partition. Smith v. Fly, 24 Tex. 349-350, 76 Am. Dec. 109; O'Connell v. Duke, 29 Tex. 312-313, 94 Am. Dec. 282; Daughtrey v. Knolle, 44 Tex. 455-456; Moore v. Hazelwood, 67 Tex. 626, 4 S. W. 215; Willoughby v. Long, 96 Tex. 199, 71 S. W. 545.

The trial court found that the land described in appellee's petition was susceptible of equitable partition; that the excess occurred by mutual mistake. The evidence sustains these findings. But the question still remains: Is the excess material? We think so. Equity will grant relief, even where the sale is in gross, if the excess is large. Cox v. Burton (Tex. Com. App.) 212 S. W. 654. A much less excess will afford ground for relief where the sale is by the acre.

[7] It is true that the excess in the instant case is only 1.8 per cent. over the 3,000,000 acres intended to be granted, but it is nevertheless 55,089 acres, and we do not think so great an excess can be regarded as immaterial, whatever be the number of acres intended to be granted. When it was discovered that by reason of the conflict with New Mexico there was a shortage of 16,000 acres,

Taylor did not consider this immaterial, although it was only about one-half of 1 per cent. of the 3,000,000 acres he was to receive under his contract. On the contrary, he demanded that this deficiency be made good. The state, the other party to the contract, recognized the justness of this demand, and complied with the same.

"It has long since been settled, that the *relative extent* [italics ours] of the surplus or deficit cannot furnish, per se, an infallible criterion in each case for its determination, but that each case must be considered with reference not only to that, but its other peculiar circumstances." O'Connell v. Duke, supra, 29 Tex. 310, 311, 94 Am. Dec. 282.

There is another circumstance which we think is entitled to some weight in determining what was the intention of the parties. In this connection, it should be remembered that the Capitol Commissioners who represented the state was composed of the Governor, the Attorney General, the Comptroller, the Treasurer, and the Commissioner of the Land Office; that they had no authority in the premises, except that which was conferred upon them by the Legislature; and that the Legislature had limited them to the use of 3,000,000 acres of land in procuring the erection of the capitol. It is not to be presumed that these honorable gentlemen did not know the limitation of their authority, or that they knowingly exceeded the same. Did they contemplate that the surveys as made might contain an excess of more than 55,000 acres, and, if so, that the contractor should have the same? One of the tests, as stated in O'Connell v. Duke, supra, 29 Tex. at page 311; 94 Am. Dec. 282, is: Would "such excess, if known, * * * have materially influenced the" parties? As private individuals they might have been willing to "throw in" such excess, in a deal of this magnitude, should a subsequent survey reveal the existence of the same, but we cannot conceive that they contemplated any such possible unauthorized disposition of the public domain.

It is further contended by appellants that, even though the state be the owner of the excess, if any, it is not entitled to recover the entire amount thereof from the appellants. The facts bearing upon this issue are briefly stated in our thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, nineteenth, and twentieth findings of fact, supra.

[8] The state contends; and, as we think, with much force, that Taylor and the Farwells were, in fact, the Capitol Company. Whether or not this be so, the Capitol Company, by virtue of its contract with Taylor, became the equitable owner of all of the land theretofore, or thereafter earned by Taylor under his contract with the state. The original trustees sold portions of this land, and with the proceeds paid off the company's

debts, evidenced by its debentures, and thereafter the said trustees conveyed the legal title to the remainder thereof to the Capitol Company. The Capitol Company sold portions of the land conveyed to it, and on the 14th day of June, 1915, deeded the unsold portion thereof to the appellants, in trust, for the purposes of winding up the affairs of the company, then in process of liquidation, and which has since been dissolved. The appellants paid nothing for the land. They have no beneficial interest therein. They hold the legal title for the purpose of distributing the proceeds of the land among the stockholders of the former corporation, the Capitol Company. That the deed to them constitutes a common-law trust does not alter the essential facts as here stated. Such being the case, the present trustees, appellants herein, are, for the purposes of this suit, the Capitol Company, and have in their possession more than enough land to satisfy the demands of the state, namely, nearly 600,000 acres. The state, by bringing this suit and by its pleadings herein, having ratified the sales previously made, is entitled to have the excess set apart to it in a partition of the land now in the hands of the appellants. It was not necessary to make the purchasers of other portions of the 3,000,000 acres parties to this suit. Campbell v. Campbell (Tex. Civ. App.) 145 S. W. 638; Land Co. v. Hyland, 8 Tex. Civ. App. 601, 28 S. W. 206; Byrn v. Kleas, 15 Tex. Civ. App. 205, 39 S. W. 980; Hanrick v. Gurley, 93 Tex. 459, 54 S. W. 347, 55 S. W. 119, 56 S. W. 330; Peak v. Swindle, 68 Tex. 242, 4 S. W. 478; Moonshine Co. v. Dunman, 51 Tex. Civ. App. 159, 111 S. W. 161; Broom v. Pearson (Tex. Civ. App.) 180 S. W. 895.

[9] We think it immaterial that there has been a substantial change in the stockholders of the Capitol Company since it was first organized. The corporation, and not its stockholders, was the owner of the land, and, disregarding mere matters of form as equity does, the corporation, in the person of the present trustees, the appellants herein, is still the owner of the land which the trial court decreed should be partitioned in this suit.

Appellants' fifteenth assignment of error is:

"The district court erred in decreeing a partition of the land in Schedule X, without first fixing the price or value of the lands covered by the contract for the building of the State Capitol, as contemplated in said contract, and giving the owners of the land described in Schedule X an opportunity to prevent a partition of same by paying to the state the price or value of the excess thus fixed by decree of court."

A sufficient reply to this is the appellants did not offer to pay for the excess, or indicate in their pleadings a willingness to do so. No money valuation was fixed upon the land when the contract was made with Schnell, and the evidence does not show with any degree of certainty its value at that time. In Ladd v. Pleasants, 39 Tex. 416, the court said:

"If he wanted this land [the excess] equity would require him to have tendered the money at the price paid, or at least at a fair value, for the remainder of the land."

[10] As to the contention that a portion of the land had been sold to Lee & Scott prior to the sale to the original trustees, the answer is that the record does not show that these lands were not conveyed to the Capitol Company. They were patented to Taylor. The agreed statement of facts states that, as the leagues were patented to Taylor, he conveyed them to the original trustees. The transaction between Taylor and Lee & Scott was an exchange of lands. For aught that appears to the contrary, Taylor may have reacquired these lands from the Capitol Company for the purpose of making this exchange, and the Capitol Company may have been the beneficiary of such transaction. At least the fact that Taylor conveyed these lands to Lee & Scott in 1888 is not sufficient to overcome the express agreement of the parties that all of the leagues were conveyed by Taylor to the trustees of the company as the same were patented. For aught that appears to the contrary, Lee & Scott may have obtained a deed to these lands from the Capitol Company, and for the purpose of strengthening their record title obtained a deed from Taylor, the patentee, also.

[11] Appellants assign error as to the admission of the Wiley field book, for the reason that the same is hearsay, it having been shown that Wiley was one of the surveyors who was working for Munson, and that he made the entries in his field book only by the hearsay testimony of his wife, which was objected to by appellants. The trial court in its qualification of the bill of exceptions on these matters states that he did not consider the hearsay declarations of Wiley's wife as to that matter, but that he admitted the field book upon other evidence relating thereto. We think that it appears from the record that such other evidence clearly warranted the court in admitting this field book in evidence. The length of this opinion precludes a discussion of such evidence.

[12] We overrule appellants' contention that the report of Mabry was hearsay, and therefore inadmissible. Mabry made his survey as the agent of both parties. He was county surveyor of Oldham county. His report was filed in the Land Office, and was an archive thereof. His original report, as well as a certified copy thereof was read in evidence. R. S. art. 3694; Denton v. English (Tex. Civ. App.) 171 S. W. 250.

Finding no error of record, the judgment of the trial court, in so far as it relates to the partition of the lands described in Exhibit X of appellee's petition, is affirmed.

### Findings of Fact in No. 36184 (District Court No.).

(1) The evidence does not show that surveys Nos. 221, 222, 223, and 224, south of the alleged vacancy, and surveys Nos. 225, 226, 227 and 228 on the north thereof, were made by the same surveyor.

(2) If they were, such surveyor did not run out on the ground and connect the south corners and lines of the surveys to the north with the north lines and corners of the surveys to the south.

(3) The surveys south of the alleged vacancy were run out from connections with prior surveys to the south, and the surveys north thereof were run from prior surveys to the north.

(4) The northeast and northwest corners of Nos. 221, the northwest and the southwest corners of 222, the southeast and southwest corners of 223, and the northeast and northwest corners of 217 are found and identified on the ground by the objects called for in their field notes, and are as indicated by the circles on the following map:

(5) The south corners and lines of 225, 226, 227, and 228 call to be identical with the north lines and corners of 221, 222, 223, and 224.

(6) None of the south corners or lines of the surveys north of the alleged vacancy have been found or identified on the ground.

(7) The beginning corner of No. 225 is at the southeast corner of No. 61, in block B–58, a prior survey. The northwest corner of No. 225, the northeast corner of 226, the northwest and northeast corners of 227, and the beginning corner of No. 228, at the southwest corner of No. 1, in block 44, a prior survey, and the southeast corner of No. 228 are found and identified on the ground as indicated by the circles on the foregoing map.

(8) If the surveys to the north be run from their known corners, according to the courses and distances called for in their field notes, the corresponding corners in the surveys to the south will not be reached, but the surveys to the north, when thus run out, will be located as shown on said map.

(9) The calls in the surveys to the north for the lines and corners of the surveys to the south are supposititious calls, and were made upon a mistaken belief as to the location of such corners.

## Opinion.

The trial court found that a vacancy existed as alleged by the state and as shown by the map in our statement of facts. Appellants' attack upon this judgment is based upon the assumption that the surveys to the north and those to the south of the alleged vacancy were made by the same surveyor, at about the same time, and upon the presumption that such surveyor actually ran these surveys upon the ground, and connected them as called for in his field notes.

[13] The presumption of an actual survey is based upon the presumption that public officers always do their duty. This, like all rebuttable presumptions, obtains in the absence of evidence to the contrary, and not against such evidence. That a survey was not made upon the ground may be shown by circumstances. We think the circumstances in the instant case are sufficient to overcome the presumption of an actual survey of the south lines of the leagues north of the alleged vacancy, except the south line of survey No. 228, which is identified by objects called for in its field notes, and found upon the ground.

It is not questioned by either party hereto that both the northern lines of the southern tier of surveys and the north lines of the northern tier of surveys were actually surveyed on the ground, and that they are located by their corners, found and identified as indicated by the map in our statement of facts. The northwest corner of 225 being found and identified, and no objects being called for at its northeast corner, this corner is established by running east the course and distance called for. This corner, which is also the northwest corner of 226, should be treated as an established corner.

Upon the assumption of an actual survey of 225, by the same surveyor who ran out 223 and 224, the natural thing for him to have done, in order to have connected 225 with his previous work, would have been to begin 225 at the northeast corner of 224, or the northwest corner of 223. Instead of doing so, 225 is tied to northern surveys previously made, by calling to begin at the southeast corner of No. 61, which is found and identified on the ground. The calls from this beginning corner are thence south and east, no objects being called for; the call being "to a point." As the method employed throughout the 738 capitol league surveys actually made was to make mounds and dig pits, the surveys being upon a treeless plain, the absence of calls for such mounds and pits is, to say the least, some evidence that such lines were not run.

The second call is east 3,285 varas to a point 1,359 varas south of the northwest corner of 223. Neither 223 nor 224 is otherwise mentioned in these field notes. To reach this point the line must be extended 586 varas, which is a glaring mistake to make in measuring a line intended to be 3,285 varas.

The next call is north to a point for the northeast corner of 225. If the surveyor ran this line from a point on the west line of 223, he conflicted with No. 226 to the extent of 586 varas, or 519 acres.

The presumption that a surveyor, making two surveys at the same time for the same person, and calling for them to adjoin each other, would not place them on the ground so as to conflict with each other, is so strong that it would take absolutely conclusive evidence that he did so to establish such fact.

Assuming that he made a corner on the west line of No. 223 as called for in his field notes, to run the next line to the corner which he made for the northeast corner of 225 and the northwest corner of 226, instead of running north as called for in his field notes, he must have run about N. 16° W. In this event he would still be in conflict with 226 to the extent of about 250 acres.

Survey No. 228 does not call for 221. It is evident by its call for the northeast corner of 227 at the proper course and distance that the south lines of 227 and 226 were intended to be a projection west of the south line of 228, which is found and identified by the objects called for in its field notes, and is thus located as shown by the map herein.

No. 227 calls to begin at the northeast corner of 226, and to run thence north 5,000 varas to its northeast corner, found and

identified. If the surveyor ran from the northeast corner of 226 to the northeast corner of 227, instead of running north, he ran about N. 16° W. The same is true as to the connecting lines between the other known corners on the north line of the northern tier and the known corners on the northern lines of the southern tier. This could have happened only by his misreading the face of his compass 16 degrees, not as to one run only; but as to all of the runs necessary to be made in a line 5,000 varas long, and not as to one line only, but as to three such lines. Such mistakes are unthinkable.

If survey No. 227 was so run upon the ground, it conflicted with 228, made by the same surveyor at the same time for the same party. To so hold we would have to disregard the calls for distance, course, quantity, and configuration. The same is true as to the other surveys to the north.

[14, 15] From the foregoing facts, we think but one deduction can reasonably be drawn, and that is that the surveyor who made surveys Nos. 225, 226, and 227 did not run their southern lines, but that he called for the corners of Nos. 221, 222, and 223, and the west line of 223 upon an erroneous supposition as to the location of such line and corners. A supposititious call, made upon an erroneous belief as to the location of the object called for, will not prevail over a call for course and distance, whether the survey was actually made upon the ground, or the same was an office survey. Railway Co. v. Thompson, 65 Tex. 192; Adams v. Crenshaw, 74 Tex. 111, 11 S. W. 1083; Holland v. Thompson, 12 Tex. Civ. App. 471, 35 S. W. 19; Sellman v. Sellman (Tex. Civ. App.) 73 S. W. 48; Lafferty v. Stevenson (Tex. Civ. App.) 135 S. W. 218–220.

[16] The foregoing proposition may be substantially stated thus: A call in field notes inserted by mistake will be rejected, and the survey will be constructed as though such mistaken call had not been inserted. State v. Sulflow, 60 Tex. Civ. App. 615, 128 S. W. 654. Or, as applicable to the facts of the instant case, we might deduce from the decision in Huff v. Crawford, 89 Tex. 216–220, 34 S. W. 606, this statement: The surveyor who made surveys Nos. 225, 226, and 227 did not, by mistake, locate the southern corners of such surveys at places different from where he intended to locate them. He intended to and did locate them at the northern corners of the surveys to the south, as he supposed them to be located on the ground. His mistake was as to their true locality.

[17] We think it highly probable that the surveys to the south of the vacancy and those to the north were made by different surveyors. It is true that the contract for surveying the capitol leagues was let to J. T. Munson, but it does not follow from this that he did all of the work in the field in surveying these more than 700 leagues, or that in fact he did any of it. The Commissioner who represented the state in making these surveys stated in his report that there were two surveyors, who worked from 5½ to 30 miles apart.

Believing as we do that the trial court did not err in its finding of facts, nor in its application of the law to the same, we affirm the judgment herein.

Findings of Fact (District Court No. 36185).

The map on opposite page will aid in understanding this case:

The alleged vacancy lies north of surveys Nos. 336, 337, 338, and 339, and south of 274, 275, and 276. The corners marked with a circle are found and identified, and their location is not in dispute herein. The trial court found, in substance, as follows:

(1) Surveys Nos. 337, 338, 339, 340, 372, and 373 were made by J. T. Munson, or by some one working for him, as were also the original surveys Nos. 274, 275, 276, 333, 336, and 335.

(2) It was found that Munson's surveys of Nos. 274, 275, 276, 333, and 335 were in conflict with prior surveys. For the purpose of taking these surveys out of such conflict and of reducing the excess in such surveys, they were, by agreement of the contractor and the state, resurveyed by W. S. Mabry, and the patents were issued on Mabry's survey, and accepted by the contractor.

(3) Mabry corrected the field notes of 336 and 335, and put in the new surveys Nos. 333½ and 345½.

(4) No object is called for in the field notes of either Munson's or Mabry's survey at the northeast corner of 273, nor at either of the south corners of 274, 275, nor at the southwest corner of 276. Both Munson and Mabry call for the southeast corner of 276 to be at the southwest corner of 333, and for the monument found and identified at that corner. In connecting the field notes of 333 so as to take it out of conflict with prior surveys to the west, Mabry did not change the southwest corner of the northwest corner thereof as made by Munson, both of which corners are found and identified by objects called for in the field notes of 333.

(5) No objects are called for at the northeast corner of 339, nor at either of the northern corners of 338, 337, and 336, nor at the southeast corner of 336.

(6) None of the corners mentioned in the next two preceding paragraphs hereof were made upon the ground, except the southwest corner of 333, and none of the lines connecting these corners were run upon the ground by either Munson or Mabry.

(7) Mabry's field notes of 276 call for it to begin at the southwest corner of 333, and to run thence with the lines of the prior sur-

vey on the north and west until a point is reached on the south line of No. 100. The calls from thence are south 4,273 varas to a point on the north line of 337; thence east 5,956 varas to the northeast corner of 336; thence south 2,000 varas to a point; thence east 1,948 varas; thence north 2,000 varas to a point in the south line of 333; thence west 1,168 varas to the beginning.

His field notes of 275 call to begin at the southwest corner of No. 100, and running thence with prior surveys to a point on the south line of survey 89; thence south 2,272 to a point on the north line of 338; thence east 5,507 varas to a point in the north line of 337; thence north 4,273 varas to a point

in the south line of No. 100; thence west 794 varas to the beginning.

His field notes for 274 call to begin at a point the northeast corner of 275, which is on the west line of No. 99; thence north, west, and south with prior surveys to a point on the south line of No. 89; thence south 3,302 varas to a point the southeast corner of 273; thence east 2,643 varas, crossing Trujillo and Mujares creeks, to a stake in the west line of No. 93; thence with the prior surveys to the beginning.

(8) No object is called for in the field notes of 333½ nor 345½, except at the southwest corner of 333½, which is found and identified on the ground, by the northwest corner of

No. 103, a prior survey. No. 345½ calls to begin at this corner.

(9) The calls in the field notes of 274, 275, and 276 were made by both Munson and Mabry, upon the erroneous conjecture .that the southeast corner of 272, which is also the northeast corner of 340 and the northwest corner of 339, was due west of the southwest corner of 333, or, what amounts to the same thing, that the southwest corner of 333 was due east of the southeast corner of 272. Mabry intended that surveys Nos. 274, 275, and 276 should have their southern corners on a line projected west from the southwest corner of 333, which he erroneously supposed would be on the north lines of surveys Nos. 336, 337, 338, and 339.

(10) A line projected west from the southwest corner of 333 will not be the same as a line projected east from the southeast corner of 273, but will be 741 varas north of such line.

(11) If surveys Nos. 276, 275, and 274 be constructed according to their calls for prior surveys and to the south the distance called for their infield notes, disregarding the calls for the league surveys on the south, No. 276, by reason of some excesses in the prior surveys, has an excess of 68 acres; No. 275, for the same reason, has an excess of 125 acres; and No. 274 has the quantity called for in its patents.

(12) The north lines of surveys Nos. 339, 338, 337, and 336 are correctly constructed by projecting said line from the identified northwest corner of 339 east parallel with the south lines of these surveys, and intersecting this line by lines from the southern corners of such surveys. Said lines so established will be as shown on the foregoing map. Survey No. 333½ is as shown on said map.

These findings are sustained by the evidence.

## Opinion.

There is no dispute as to the location of the north lines of surveys Nos. 274, 275, and 276. There is no reasonable ground for dispute as to the north lines of surveys Nos. 339, 338, 337, and 336. It is not made to appear that anything is found on the ground by which these lines can be located, except the northwest corner of 339, and southwest corner of 339, the southeast corner of 338, and the southwest corner of 337. This being the case, the north lines of said surveys must be located by running course distance as called for in their field notes from these known corners. When thus run out, they are located as indicated on the map in our findings of fact, supra. The points marked with a circle on this map indicate corners found and identified by objects called for in the field notes.

All of the capitol league surveys appearing on said map were originally made by Mun-

son, or by some one working for him, except Nos. 335½ and 345½. These are new surveys put in by Mabry, composed of excess found in Munson's surveys.

Some of the Munson surveys having been found to be in conflict with prior surveys, and also to contain excesses, by agreement of parties, Mabry corrected the field notes of a number of such surveys, including 274, 275, 276, 333, and 336. He did not, however, change the original corners of 333 as made by Munson.

[18] Munson's surveys having been abandoned, and Mabry's surveys substituted therefor, and the patents issued on Mabry's surveys having been accepted by Taylor, it is immaterial what lands were embraced in Munson's surveys 274, 275, 276, and 336. The inquiry here is what is the true location of the lines and corners of these surveys as made by Mabry. Montgomery County v. Angier, 32 Tex. Civ. App. 451, 74 S. W. 958, 959; Sullivan v. State, 41 Tex. Civ. App. 89, 95 S. W. 648; Forbes v. Withers, 71 Tex. 306, 9 S. W. 154.

[19] Except upon one theory to be hereafter discussed, we do not think that there can be any reasonable ground for dispute as to the proper location of the south lines of 276, 275, and 274; and that such location is on a line running west from the southeast corner of 333 to a point in the east line of 273, as indicated by the map herein. If we are correct in this, it follows that the land, if any, between the line projecting east from the northwest corner of 339, and the line projecting west from the southeast corner of 333, is vacant land. They are not the same, as by the undisputed evidence the northwest corner of 339 is nearly 1,000 varas farther south than the southwest corner of 333.

Our reasons for locating the south boundaries of surveys Nos. 274, 275, and 276 on a line projected west from 333 are briefly these:

Mabry first surveyed 276. He began at the southeast corner of 333. He ran north to the south line of 107. He then ran west and north with the prior surveys shown on the map until he reached the east line of survey 100, which he was able to locate by reason of its connection found in that block of prior surveys. He then ran west to a point on the south line of No. 100. His call is thence south 4,273 varas. By balancing his northings and southings, we find that if he made no mistake in measuring this line, if he did measure it, he arrived at a point due west of where he began. His next calls are east 5,956 varas; thence south 2,000 varas; thence east 1,948 varas; thence north 2,000 varas to the south line of 333; and thence west 1,168 varas, to the place of beginning. If he made no mistake in measuring these lines, his last call north 2,000 varas brought him to the south line of 333, and his last run

closed the survey at the point where he began.

Did he make a mistake in running south from No. 100 of 741 varas? If so, in order to reach the south line of 333 and run thence west to his beginning corner, he must have made exactly the same mistake in measuring the last line running north 2,000 varas. In other words, this line served as a check against his line running south from No. 100, and would have revealed any error that he may have made in measuring that line, unless he made the same mistake in running north to the south line of 333. Such a supposition is altogether improbable.

But, argue the appellants, Mabry's line running south from No. 100 calls to run to the north line of 337. True, but he did not reach this line unless he made a mistake of 741 varas in measuring south from No. 100. He could not have known whether or not he had reached the north line of 337 unless he had known where such line was. It being an unmarked prairie line, he could not have known where it was unless he had gone to the identified northwest corner of 339 and run the north lines of 339, 338, and 337 according to their calls. Appellants' theory is that he did this. Grant it for the sake of argument. Having run out the north lines of these leagues, by means of stakes set thereon, he was able to know when he reached the same by running south from No. 100. He ran from the south line of 100 south to the north line of 337 as found by him on the ground, but in doing so he made a mistake of 741 varas in his measurement. This is appellants' theory.

But let us pursue this theory to its legitimate conclusion. By so doing, we will see that the assumed mistake in measuring south from No. 100 to the ascertained north boundary of 337 is not reasonable.

Having ascertained the location of the north line of 337, and actually ran to it, though mistaken in the distance, his field notes say that he ran east to the northeast corner of 336, the location of which was ascertainable by continuing the north line of 337 the distance called for in its field notes. This would have brought him to the northeast corner of 336, as shown by the map herein. Continuing the calls in his field notes, he next ran south 2,000 varas; thence east 1,978 varas; thence north 2,000 varas to the south line of 333; and thence west 1,168 varas to the beginning, which it will be remembered was the identified southwest corner of 333. Now, if we are to presume that Mabry ascertained the location of the north line of 337 by running east from the ascertained northeast corner of 339, a distance of 1,500 varas, we ought to presume that he ascertained the south line of 333 by running the same from its ascertained southwest corner a distance of only 1,168 varas. If he did so, in running north to this line he did not reach the same by 741 varas, unless he made exactly the same mistake in measuring north the line calling for the south line of 333 that he had made in measuring south from the south line of No. 100 to the north line of 337, a supposition entirely unreasonable. Running the line north 2,000 varas for the south line of 333 would have served as a check on his measurement south from No. 100, and thereby he would have discovered the mistake, if any he had made, in running south from No. 100 to the north boundary line of 337. Had he discovered such mistake, he would have seen that he had included in No. 276, as thus made by him, an excess of about 800 acres. As one of the objects of Mabry's surveys was to take the excess out of Munson's surveys, we ought not to presume that he would knowingly include 800 acres excess in 276. Having discovered his mistake in measuring south from No. 100 to the north boundary of 337, he doubtless would have corrected the same by calling for that line to be its correct distance; that is, the distance which he supposed he had measured, plus the additional 741 varas discovered in running north to the south line 333, and changed the calls from the point reached by him on the north line of 337 to a point on said line farther east, so as to make 276 embrace only one league of land.

We have said that presumably Mabry ascertained the location of the south line of 333 by running it out from its northwest corner, the location of which we know that he knew, for the reason that he began 276 at that point. But this assumption is not necessary, for the reason that in running his closing line west 1,168 varas he would have found that, instead of arriving at the place of beginning, he had arrived at a point 741 varas south of his beginning corner.

To our minds these facts show quite conclusively that Mabry did not ascertain the location of the north line of 337, but that he called for the same upon the erroneous conjecture that he had reached the same by running south from No. 100 the distance called for in his field notes, and that he actually ran that distance, and thus established the southwest corner of 276, if he actually surveyed the south line of 276.

Again, Mabry began 275 at the northwest corner of 276 on the south line of No. 100. The southeast corner of 275 is the southwest corner of 276. He called to run 275 with the prior surveys to a point on the south line of No. 89, and thence south 2,272 varas to a point on the north line of 338. This point, if he made no mistake in measuring south from 89, was due west from the southeast corner of 333. To have run the next call east the distance called for and to have arrived at the southwest corner of 276 as made by him on the north line of 337, as contended by appellants, he must have made exactly the

same mistake of 741 varas in measuring the west line of 275 that he made in measuring the west line of 276, if he actually placed that corner on the north line of 337. He must have made exactly the same mistake in running the west line of 274. That is to say, his last run south on 274 according to the distance called for would place him due west from the southeast corner of 338, but if he ran to the southeast corner of 273 on the north line of 339 as called for in his field notes, he again made a mistake of 741 varas in measuring his last line south. It is not conceivable that such mistakes could have been made in running four lines, each of which, if correctly measured, would have shown the mistake in the measurement of the others.

If surveys 276, 275, and 274 be extended to the north lines of 239, 238, 237, and 236, these three surveys will contain an excess of 2,660 acres. But if, on the other hand, we locate them by beginning at the southwest corner of 333, run with the lines of the prior surveys, and run the calls south the distance called for, all of the southern corners of 276, 275, and 274 will be due west of the southwest corner of 333, and, with some slight excesses, occasioned by some of the lines of the prior surveys being slightly in excess of the distances called for in their field notes, these surveys will contain one league each.

We think it probable that Mabry's mistake in supposing that the north lines of the southern tier of surveys was a line running west from the southwest corner of 333 arose from the fact that Munson had so mapped them. He might well have supposed that this was the true location of such line, but that is not true, as is shown by the northwest corner of 339 being found 940 varas to south of such line.

If it be said there is no vacancy, for the reason that Munson ran the north lines of 339, 338, 337, and 336 east from the northeast corner of 339, and ran 374, 375, and 376 to these lines, as is shown by his calling for these surveys to adjoin each other, the answer is: Munson's surveys of 374, 375, and 376 were abandoned, and Mabry did not so run their lines.

The contention that, because Mabry's field notes of 276, 275, and 274 call to run to the north lines of 337, 338, and 339, his call for distance must be disregarded and such lines must be extended to the lines of the surveys called for, even though the same are on unmarked prairie lines, is based upon what appellants insist was decided in Maddox v. Fenner, 79 Tex. 279, erroneously reported in 15 S. W. 239, as Maddox v. Turner, namely, that a call for an unmarked prairie line which may be accurately ascertained will, as a matter of law, prevail over a call for course and distance. No such proposition was announced in that case, and could not have been without overruling many well-considered cases to the contrary. Whether or not such a call will prevail over course and distance depends upon all of the facts in evidence in the particular case. That the court, in Maddox-Fenner, did not intend to announce any general rule on the subject is evidenced by the following excerpt from the opinion in that case: "Probably no general rule on the subject can be safely announced."

In that case the court based its finding that the call for distance in the third line should be disregarded upon the following facts: The Stevens' survey was entirely surrounded by prior surveys, and purported to cover all of the vacancy between such surveys. It was only by running out the Stevens survey that the conflict was discovered between the call for distance in the third line and its call for the Hassey survey (Deen, assignee). If the third line was extended to the Hassey corner, all the other calls would be found to be correct. The field notes of the Stevens' survey showed the corner of the Hassey, and the corners of the other surveys were fixed by mounds and by posts and mounds. If these marks existed at the time the surveyor located the Stevens, they were visible objects, and it is not probable that he was mistaken when he said that he ran to them. As all of the surveys were probably made about the same time, it is likely that these objects were in existence when the Stevens' survey was made. That they were not found when the suit was brought is not strange, as the Stevens' survey was made in 1846, and the suit was brought in 1891. When an object of a perishable nature is called for in field notes, and cannot be found after the lapse of considerable time, the presumption is that it existed when the survey was made and has since perished. Stafford v. King, 30 Tex. 269, 94 Am. Dec. 304.

If the surveyor in locating the Stevens' survey had run only the distance called for his third line, he would not have found any of the mounds and posts which he says he found at the corners of the Hassey, the Sharp, and the Skidmore surveys, for he would not have been in the vicinity of such corners.

[20] There is an expression in the Maddox-Fenner Case which has created an erroneous impression, and that is, under the limitations therein stated the court said:

"We see no good reason why the survey line [called for] should not be given the dignity of an 'artificial object.'"

Under some circumstances, there is no reason why it should not; in others, there is. But before discussing this point, we call attention to the fact that a call for "an artificial object," or even for a natural object, will not necessarily control a call for course and distance. Stafford v. King, 30 Tex. 272,

94 Am. Dec. 304; Robinson v. Dogs, 53 Tex. 506; Hubert v. Bartlett's Heirs, 9 Tex. 104; Booth v. Upshur, 26 Tex. 70; Booth v. Strippleman, 26 Tex. 441; Browning's Adm'x v. Atkinson, 37 Tex. 659; 4 R. C. L. 105.

Why will a call for an "artificial object" prevail, as a general rule, over a call for distance? Because an artificial object is visible, and when a surveyor says that he ran to such object he was probably not mistaken, and if such object can be found and identified, it indicates the point to which the surveyor arrived, though the distance called for may not reach such point. However, in any given case, consideration of all of the facts and circumstances may show that the call for distance is the more reliable call.

[21] An unmarked prairie line is not, in the general acceptation of the term, a visible object, and therefore, in common parlance, is not an object at all. But, if a surveyor runs such line from its ascertained corner, the place where he locates the same on the ground does become visible to him, and therefore it may be said, not only to have "the dignity of an artificial call," but to be to him actually an artificial object, as that term is used in reference to the law of boundary.

[22] Whether or not it ought to be presumed that a surveyor ran out an unmarked prairie line called for in his field notes, and thus ascertained its location upon the ground will depend upon the proximity of marked corners or lines from which such line could have been run. If they were near by and could have been ascertained with certainty, it is reasonable to presume that he ran out such prairie line. If it would have been difficult to have found them, or if they were at a considerable distance, such presumption would be very weak, to say the least of it.

It will be seen that if the surveyor in the Maddox-Fenner Case found the mounds and posts which located the corners of the adjacent surveys, there would have been no occasion for him to have run from other known corners of such surveys or of adjacent surveys in order to ascertain the lines of the surveys called for in his field notes.

[23] We are cited to cases in which it is said that the intention of the surveyor or of the grantor must be given effect. From this it is argued that, as Mabry's field notes and the patents issued on the same call for the south line of the north leagues to extend to the north lines of the south tier of surveys, it was the manifest intention of the surveyor and of the state not to leave a vacancy between such surveys. But it gets us nowhere to say simply that the intention of the surveyor or grantor must prevail. There must be added: As appears upon the face of the field notes or grant read in the light of all the circumstances of the particular case. Blackwell v. Coleman County, 94 Tex. 216,

59 S. W. 530. In every case in the books where the field notes call to begin at a known point and to run a given course and distance to the line of a prior survey, and thence with the line of such survey, it was the intention of the surveyor not to leave a vacancy between such surveys. But it is equally manifest that he intended to run the exact distance called for in his field notes. If, upon applying these calls to the ground, there is shown to be a conflict in them, there is manifested two intentions. To give effect to one destroys the other. In such case, the prevailing intention will be determined by ascertaining the same under the rules relating to boundary. Such intention will be indicated, not by what the surveyor intended to do and thought he had done, but by what, in fact, he did do. In other words, where did he actually locate the lines and corners of the survey made by him? and not simply where did he intend to locate the same with reference to some other survey? This is to be done by ascertaining as best we can, which of the contradictory calls was inserted by mistake, and by rejecting such mistaken call.

Applying the rules of law with reference to boundary, which rules are based upon reason and experience, we have concluded that the calls in the field notes of the northern tier of surveys for the lines of the southern tier were made upon the mistaken conjecture of Mabry as to the location of the lines so called, and should be rejected. As thus construed, the lines of 276, 275, and 274 will be located upon the ground where Mabry placed them by running the courses stated in his field notes, and also where he supposed the north lines of 237, 238, and 239 to be located.

For the purpose of avoiding confusion, we have referred to the north lines of surveys Nos. 339, 338, 337, and 336 as being located by running due east from the northwest corner of 339. As a matter of fact this line as found by the trial court runs N. 89° 19' E. or 71 minutes north of east. We have referred to south lines of 274, 275, and 276 as if they constituted an unbroken line. This is not true. As will be seen by reference to the map, the south line of No. 92 breaks the continuity. However, these facts do not affect our conclusions, nor the reasons upon which they are based:

For the reasons stated, the judgment of the trial court herein is affirmed.

Affirmed.

## On Motion for Rehearing.

It was not without difficulty that we arrived at the conclusion stated in our original opinion, that the state was entitled to partition herein. Appellants, in their motion for a rehearing, assert that if it be conceded that the sale was by the acre, and that by

mutual mistake the surveys are excessive to the amount found by the trial court, still the state is not entitled to recover such excess by a partition of the lands remaining in the hands of the trustees, appellants herein, but that its remedy is to reform the grant and to recover the specific land patented to the Capitol Company, after the full amount of 3,000,000 acres had been patented, none of which is included in Exhibit X, and as to which the partition was decreed by the trial court.

The able argument, in support of their contention on this point, made by appellants in connection with their motion for a rehearing, has caused us to carefully review our decision on this point, and, having done so, we have reached the conclusion that we were not in error as to this matter.

. The argument of the appellants may be briefly summed up as follows:

[24] The state contracted to convey to the contractor, in payment for constructing the new capitol, 3,000,000 acres of land, by good and perfect title, the same to be conveyed from time to time as the work progressed, beginning with survey No. 1, and continuing consecutively, by numbers, until the entire 3,000,000 acres had been granted; that the grants were made substantially in this manner; that as each patent was issued the Capitol Company obtained, not only the legal title to the land therein described, but also the equitable title to all of such land as it paid for from time to time; that it paid for 3,000,000 acres, and that it is immaterial that any or all of the surveys contained excesses, so long as the total amount actually included in the surveys by their consecutive numbers did not exceed 3,000,000 acres, and that up to this point the appellants obtained both the legal and equitable title to the land described in the patents issued to it; that if the officers of the state issued to the Capitol Company patents to any lands after this point had been reached, taking the surveys in their numerical order, such patents may be void for want of authority to issue the same, but, if so, the state's remedy is to sue for the recovery of the specific lands so illegally granted, and not for a pro rata share in the lands both legally and illegally granted.

To our mind, a sufficient reply to this very plausible contention is this: So much of the contract as provided for the issuance of patents to surveys in their numerical order, beginning with No. 1, is directory. In fact, the same was disregarded in a number of instances, without objection, so far as the record shows, on the part of the contractor.

The contract to build the capitol for an agreed consideration was one, and indivisible. It was not to pay so much for constructing a certain part of the building, and so much for additional parts. The advanced payments made from time to time, as the work progressed, is such as is usually found in builders' contracts, and it is immaterial that the payments were made in acres of land instead of dollars. Such payments are made by owners for the accommodation of contractors, for the reason that the owner feels that he is protected therefor by the value of the work done, a portion of which is usually held back. In the instant case, 10 per cent. was held back under the contract until the building was completed. The contractor had not earned a certain part of the land when he completed, say the foundation, another part when he had completed the walls, and so on. He was entitled, under the contract, to receive patents to a certain number of surveys when he had completed certain portions of the buildings, and such patents conveyed to him the legal title. But had the contractor abandoned the work after completing the foundation, he would have had no more equitable right to retain the land thus granted to him than he would have had to retain the money advanced to him had the contract been to pay money. It is true that where money had been paid, by reason of the fact that ordinarily the same cannot thereafter be identified, the owner's remedy is a suit for damages. But here the identical thing advanced on the contract can be identified, and, if the building had not been completed, and if the state had been damaged thereby to the value of the land patented, we see no reason why it could not have recovered all of such land. This upon the ground that, though patents had been issued for same, the consideration had wholly failed.

We think the contractor held the lands patented to him from time to time subject to the superior equity of the state, depending upon the contractor complying with his executory contract, and that the contract remained executory until the capitol was completed.

[25] The contract was that the contractor was to receive *all* of the leagues for constructing the capitol, the same having been theretofore surveyed and numbered consecutively. He did receive patents to all of the surveys, and took possession of the same, and the Capitol Company, through its trustees and assignees, now has possession of all of said surveys. The sale was by the acre. These surveys were supposed to contain 3,000,000 acres, no less and no more. By mistake of the surveyor, they contain an excess of 55,089 acres, exclusive of the alleged vacancies. This excess is not uniform in each league, but it is in many leagues scattered throughout the whole body of land. Such excesses are of the average value of the land. The Capitol Company has sold a large portion of these lands at prices acceptable to it, and presumably has never returned any part of the purchase money so received. It has

enough land left in the hands of the trustees to satisfy the equitable demands of the state. This is a suit in equity. The trial court had all the power of a chancellor. We do not see upon what grounds the appellants can complain, if the state sees proper to respect the sales made by the trustees and their predecessor in title, the Capitol Company, and demand, as it has done in this suit, the amount of land to which it is equitably entitled to be taken out of the lands still unsold.

The appellants further contend that, even though it be conceded that the state is the equitable owner of the excess, it is entitled to recover the same only in the event that appellants should fail or refuse to pay for such "excess," and that the state should have sued to recover the value of same, and for partition only in the alternative, and that the judgment herein should have been so rendered.

In support of this contention, appellants cite O'Connell v. Duke, 29 Tex. 300, 94 Am. Dec. 282, and Willoughby v. Long, 96 Tex. 194, 71 S. W. 545. In neither of these cases was the issue presented as to whether payment for the excess, or recovery of the same by partition, should have precedence. In O'Connell v. Duke, the appellant could not have complained as to this, for he was given the option to pay for the excess and keep it, or to surrender the same by partition. Appellant's contention was that the appellee was entitled to neither the excess nor to a moneyed judgment for the same. The court stated that the question was whether appellee could "recover such surplus, or compensation for it in money." That is, one or the other, and not which.

Willoughby v. Long was not a suit by a vendor to recover an excess or pay for the same. Long was not the vendor, but was seeking to become the vendee from the state. The issue was whether the deed from the state to Glenn conveyed the entire survey, in which there was an excess of 320 acres, or only 640 acres off of the south end of same. In the latter case Long was entitled to purchase the unsold, 320 acres. In the former case he acquired no right by virtue of his application to purchase. The Supreme Court held that the deed to Glenn conveyed the whole survey.

[26] Our view of the law on this subject is this: Where a vendor, by reason of a mistake in his deed, is the equitable owner of an undivided interest in the land conveyed by him, he has the right to have his interest set apart to him by a judgment in partition. If the purchaser desires to retain such excess, and can show an equitable reason why he should be permitted to do so, upon his tendering payment for same, he should be adjudged to be the owner of such excess. In the absence of an offer to pay for the ex-

cess, judgment for partition should be entered. Such were the facts, and such was the judgment of the trial court in the instant case. In this there was no error.

[27] Though we have not changed our views as to the existence of the vacancies as found by us, when tested by rules of law as to boundary, we have nevertheless concluded that we fell into error in sustaining the judgment of the trial court in awarding the state recovery of such vacancies.

It is evident that the state intended to convey these lands in solid bodies, without any vacancy between any of the surveys. The field notes of the various leagues call for each other, and the maps prepared by the state's surveyors, to which bidders looked, showed that the lines of the surveys were coterminous. It was the intention of the state to so grant the surveys, and of the contractors to so receive them.

By reason of the fact that several surveyors were doing the work in the field, corners were established on the ground in such manner as to leave vacancies, as stated in our original opinion herein, but in each instance these surveys called for each other. These vacancies have been sold by the Capitol Company, and the parties purchasing them have for many years been in possession of the same, and have made improvements thereon, in ignorance of the mistakes of the state's surveyors, which created these vacancies. We think, under these circumstances, the equitable title to these vacancies has been in the Capitol Company ever since the capitol building was completed. The patents should have embraced these vacancies, and equity regards that as having been done which ought to have been done.

By including these vacancies within the grants to the contractor, and increasing the excess as found by the trial court by the aggregate amount of such vacancies, to wit, 4,192 acres, the contractor gets the full amount of his 3,000,000 acres; the state gets the full amount of its excess; and the purchasers of these vacancies get what they have bought and paid for, and are not made to suffer for the mistakes of the state and the contractor, for which they are in no wise to blame.

For the reason stated, so much of our judgment herein as affirmed the judgment of the trial court awarding the vacancies and costs against the defendants in the vacancy suits is here set aside, and the judgment of the trial court is here reformed, so that the state recover nothing as to the defendants in the vacancy suits, but that the defendants therein go hence without day, and recover of and from the state of Texas their costs in this behalf expended, and that the appellee, the state of Texas, pay all costs incurred by reason of its suit herein against said defendants. That the judgment of the trial court

awarding to the appellee 55,089 acres as excess be and the same is here reformed so that the judgment shall be for an excess of 59,281 acres. As thus reformed, the judgment of the trial court is affirmed.

The motion for a rehearing is overruled. Judgment reformed and affirmed. Motion overruled.